**Catherine A. SMOLEN, Plaintiff–Appellant,**

v.

**Shirley S. CHATER, Commissioner of Social Security Administration,\* Defendant–Appellee.**

**No. 94–35056.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 13, 1995.

Decided March 29, 1996.

\* Pursuant to P.L. No. 103–296, the Social Security Independence and Program Improvements Act of 1994, the function of the Secretary of Health and Human Services in Social Security cases was transferred to the Commissioner of the Social Security Administration, effective March 31, 1995. In accordance with section 106(d) of the Act, Shirley S. Chater, Commissioner of the Social Security Administration, is substituted for Donna E. Shalala, Secretary of Health and Human Services, as the defendant. Although the Secretary of Health and Human Services was responsible for the actions of the Social Security Administration at the time of its final decision in this case, we refer to the defendant as "the Commissioner" throughout this disposition for the sake of convenience.

Ralph Wilborn, Ralph Wilborn & Etta L. Wilborn, P.C., Eugene, Oregon, for plaintiff-appellant.

P.K. Abraham and Richard H. Wetmore, Assistant Regional Counsel, Health & Human Services, Seattle, Washington, for defendant-appellee.

Before HUG, Chief Judge, FERGUSON, Circuit Judge, and SCHWARZER, District Judge.**

## OPINION

SCHWARZER, Senior District Judge.

Catherine Smolen appeals the decision of the district court affirming the denial by the Commissioner of Health and Human Services ("Commissioner") of her application for disabled child's benefits pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 416, 423 (1988 & Supp. III 1991).

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

In April 1966, when Smolen was five years old, she was diagnosed as having a Wilms tumor of the left kidney and a metastatic lesion in her lower right lung. On April 30, 1966, Smolen underwent surgery to have the Wilms tumor and her left kidney removed. Throughout the next four years, Smolen received extensive chemotherapy and radiation treatment. Although this therapy reduced the metastatic lesion in her lower right lung, Smolen developed a new metastatic lesion in her upper left lung. Because the chemotherapy and radiation treatment did not reduce this lesion, Smolen had to undergo a left upper lobectomy on April 4, 1968. After the lobectomy, Smolen continued to receive chemotherapy through July 1970. Thereafter, Smolen was apparently free of carcinoma until February 1987, when she was diagnosed as having invasive grade III ductal adenocarcinoma of the left breast. As treatment for her breast cancer, Smolen underwent a modified radical mastectomy and another year-long course of chemotherapy.

On April 23, 1987, Smolen applied for a period of disability and disability insurance benefits under Title II of the Social Security Act and for Supplemental Security Income ("SSI") under Title XVI of the Act. Both applications were denied. Smolen's application for disability and disability insurance was denied because she lacked sufficient earnings to be insured under Title II on her own earnings record; her application for SSI benefits was denied because the Commissioner expected her to regain the capacity to perform substantial gainful activity before the expiration of 12 continuous months. *See* 42 U.S.C. § 423(d)(1)(A)(1988).

In March 1988, Smolen filed a second application for SSI benefits and an application for disabled adult child's insurance benefits under Title II of the Act, based on the earnings record of her father. Both applications were denied initially and on reconsideration. Upon Smolen's request, a hearing was held before an Administrative Law Judge (ALJ). After the hearing, the ALJ issued two separate decisions, one regarding SSI benefits and one regarding disabled child's insurance benefits.

** The Honorable William W. Schwarzer, Senior United States District Judge for the Northern District of California, sitting by designation.

In the SSI decision, the ALJ found Smolen disabled beginning March 16, 1988, based on adenocarcinoma of her left breast and, therefore, eligible for SSI benefits.

In the disabled child's decision, the ALJ found that Smolen was not eligible for disabled child's benefits. To be eligible, Smolen had to have become disabled prior to November 1, 1982 (her twenty-second birthday) and to have remained disabled thereafter. See 42 U.S.C. § 402(d)(1)(B)(ii)(1988). Although the ALJ found Smolen disabled beginning in 1966 on the basis of a Wilms tumor and metastatic disease of the lung, the ALJ found that disability to have ended in April 1970. Thus, Smolen was not found disabled during the requisite time period.

Smolen timely requested review by the Appeals Council of the ALJ's decision denying her application for disabled child's benefits. In support of her request, Smolen submitted additional evidence and a written argument contending that the ALJ had failed to comply with Social Security Rulings 83–20 and 88–13 ("SSR 88–20" and "SSR 88–13"). On December 3, 1990, the Appeals Council granted the request for review, vacated the ALJ's decision, and remanded for further proceedings and a new decision.

Following additional proceedings, a second ALJ denied Smolen's application for disabled child's benefits by a decision issued October 11, 1991. In that decision, the ALJ determined that Smolen was not entitled to disabled child's benefits because she had not been disabled during the entire period beginning prior to November 1, 1982, her twenty-second birthday, through March 1987, when she developed breast cancer. Smolen made a timely request for review of the ALJ's decision. The Appeals Council denied this request, making the ALJ's October 11, 1991 decision a final decision of the Commissioner. Smolen then sought review of that final decision in the district court. The district court affirmed the decision by a judgment entered November 15, 1993, and Smolen now seeks review by this court.

Smolen contends that the ALJ erred in determining she was not disabled: (1) by improperly rejecting Smolen's subjective symptom testimony; (2) by improperly rejecting physician's opinions; and (3) by improperly rejecting lay testimony. Smolen also argues that the ALJ's decision was not supported by substantial evidence. We have jurisdiction to hear the appeal pursuant to 28 U.S.C. § 1291 and reverse and remand.

## STANDARD OF REVIEW

■ We review the district courts decision *de novo* and therefore must independently determine whether the Commissioner's decision (1) is free of legal error and (2) is supported by substantial evidence. *Fair v. Bowen*, 885 F.2d 597, 601 (9th Cir.1989). "Substantial evidence" means "more than a scintilla," *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971), but "less than a preponderance." *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n. 10 (9th Cir.1975); *see also Desrosiers v. Secretary of Health and Human Servs.*, 846 F.2d 573, 576 (9th Cir.1988). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401, 91 S.Ct. at 1427 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)). In determining whether the Commissioner's findings are supported by substantial evidence, we must consider the evidence as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir.1985). We must give the facts a full review and must independently determine whether the Commissioner's findings are supported by substantial evidence. *Stone v. Heckler*, 761 F.2d 530, 532 (9th Cir.1985). If we find that the ALJ's findings are based on legal error or are not supported by substantial evidence in the record, we may set aside the Commissioner's denial of Social Security insurance benefits. 42 U.S.C. § 405(g); *Martinez v. Heckler*, 807 F.2d 771, 772 (9th Cir.1986); *Taylor v. Heckler*, 765 F.2d 872, 875 (9th Cir.1985).

## DISCUSSION

### I. *Relevant Time Period*

■ To be eligible for disabled child's insurance benefits, the claimant must, "at the

time [her] application is filed," be "under a disability ... which began before [s]he attained the age of 22." 42 U.S.C. § 402(d)(1)(B)(ii). Other circuits have held, and we agree, that the claimant must be disabled *continuously and without interruption* beginning before her twenty-second birthday until the time she applied for child's disability insurance benefits. *See, e.g., Suarez v. Secretary of Health and Human Servs.*, 755 F.2d 1, 3 (1st Cir.1985), *cert. denied*, 474 U.S. 844, 106 S.Ct. 133, 88 L.Ed.2d 109 (1985), *and reh'g denied*, 474 U.S. 1097, 106 S.Ct. 872, 88 L.Ed.2d 911 (1986); *Reading v. Mathews*, 542 F.2d 993, 997 (7th Cir.1976); *Futernick v. Richardson*, 484 F.2d 647, 648 (6th Cir.1973); *Reyes v. Secretary of Health, Educ. and Welfare*, 476 F.2d 910, 914 (D.C.Cir.1973).

Although Smolen did not apply for disabled child's benefits until March 1988, the ALJ who considered Smolen's application on rehearing thought the period during which she had to be disabled ended in early 1987, when she developed breast cancer. (ER 281.) The parties appear to agree that this was the material time period.

The ALJ's approach assumes that Smolen can "tack" disabilities in order to qualify for benefits. In other words, Smolen would be found disabled from early 1987 onward based on her breast cancer, while relying on other disabilities for the period beginning prior to her twenty-second birthday through early 1987. However, the law is not clear on whether such tacking is permissible. *Compare* 42 U.S.C. § 402(d)(1)(B)(ii) (stating claimant must be "under *a disability* ... which began before (s)he attained the age of 22," thereby suggesting claimant may have to rely on *the same disabling impairment(s)* throughout the entire period in order to qualify for benefits) (emphasis added) *and* 20 C.F.R. § 404.1522(a) (1991) (prohibiting tacking of successive unrelated impairments to meet initial 12–month durational requirement for a finding of disability) *with* Social Security Ruling 82–52 ("SSR 82–52") (allowing tacking for re-entitlement purposes).

It is not necessary to resolve this question here. Smolen has provided evidence of underlying impairments (not including her

breast cancer) and their effect on her ability to function for the entire period from prior to November 1, 1982 to March 1988 and beyond. Therefore, we will treat that as the material time period rather than the period ending in April 1987. To be eligible for disabled child benefits, then, Smolen had to have been under the same disability from November 1, 1982 through at least March 1988.

## II. *Disability Determination*

The Social Security Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Such an impairment must result from anatomical abnormalities that are demonstrable by medically acceptable clinical or laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3)(1988); *Cotton v. Bowen*, 799 F.2d 1403, 1405 (9th Cir.1986). Moreover, the impairment must be "of such severity that [the claimant] is not only unable to do [her] previous work but cannot ... engage in any other kind of substantial gainful work which exists in the national economy...." 42 U.S.C. § 423(d)(2)(A)(Supp. III 1991).

Smolen has maintained, both below and on appeal, that beginning long before November 1, 1982 and continuing ever since, she has been disabled by chronic fatigue, pain, and susceptibility to viral illnesses caused by the combination of the following medical impairments: (1) a single kidney resulting from the left nephrectomy she underwent to cure her of the Wilms tumor; (2) reduced pulmonary function resulting from the upper left lung lobectomy she underwent to remove the metastatic lesion; (3) anemia resulting from her childhood chemotherapy and radiation treatment; (4) spinal scoliosis resulting from her childhood radiation therapy; (5) suppression of her immune system and bone marrow production resulting from her childhood chemotherapy and radiation treatment; and (6) changes in her lung tissue resulting from her childhood radiation treatment. Smolen has alleged that, as a result of the symptoms

caused by these impairments, her residual functional capacity was such that she could not maintain even sedentary work.

In support of her claim, Smolen produced evidence of: (1) her medical impairments; (2) her subjective symptoms; and (3) the effect those impairments and related symptoms had on her ability to function in school, at work, and in daily activities outside of school and work. This evidence took the form of: (1) hospital records, lab reports, and treating physicians' chart notes and letters; (2) physicians' opinions; (3) Smolen's own subjective symptom testimony; (4) lay witness testimony from Smolen's mother and sister; (5) evidence regarding Smolen's education and employment history, including a letter from Smolen's high school guidance counselor, a school transcript, and a job termination letter; (6) a physical capacities evaluation; and (7) the opinion of a vocational expert. In addition to Smolen's evidence, the ALJ considered the opinions of two physicians and a vocational expert, all of whom were hired by the Commissioner to evaluate Smolen's case.

In finding Smolen not disabled, the ALJ rejected Smolen's subjective symptom testimony, the opinions of Smolen's physicians, and the testimony of Smolen's family members. We first review the rejection of that evidence for legal error and then determine whether the ALJ's findings were supported by substantial evidence.

## A. The ALJ Improperly Rejected Certain Evidence

### 1. Smolen's Subjective Symptom Testimony

■ Smolen presented extensive testimony about her fatigue and pain and the effect those symptoms had on her ability to function during the relevant period. However, the ALJ rejected her testimony on the grounds that her "complaints regarding incapacitating fatigue ... and severe back pain were [n]ot supported by contemporaneous medical evidence and were not credible."

■ In deciding whether to accept a claimant's subjective symptom testimony, an ALJ must perform two stages of analysis: the *Cotton* analysis and an analysis of the credibility of the claimant's testimony regarding the severity of her symptoms.[1] The *Cotton* analysis is a threshold test that we set out in *Cotton v. Bowen,* 799 F.2d 1403 (9th Cir.1986), and reaffirmed in *Bunnell v. Sullivan,* 947 F.2d 341 (9th Cir.1991) (en banc); *see also Orteza v. Shalala,* 50 F.3d 748, 749–50 (9th Cir.1994) (applying *Cotton* standard to disability determination based on pain and fatigue); *Swenson v. Sullivan,* 876 F.2d 683, 687 (9th Cir.1989) (rules developed to assure proper consideration of excess pain apply equally to other symptoms). If the claimant produces evidence to meet the *Cotton* test and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so. *See Dodrill v. Shalala,* 12 F.3d 915, 918 (9th Cir.1993).

### a) The Cotton Test.

### 1) Applicable standards.

■ Under the *Cotton* test, a claimant who alleges disability based on subjective symptoms "must produce objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged....'" *Bunnell,* 947 F.2d at 344 (quoting 42 U.S.C.

---

1. The Commissioner's revised regulations, which became effective November 14, 1991, adopt the same basic scheme for evaluating subjective symptom testimony as this two-step analysis. *See* 20 C.F.R. § 404.1529. Under the new regulations, the Commissioner first determines whether there is a medically determinable impairment that could reasonably be expected to cause the claimant's symptoms (the *Cotton* test). *See* 20 C.F.R. § 404.1529(a) and (b). The Commissioner then evaluates the intensity and persistence of the claimant's symptoms, considering evidence beyond the claimant's own testimony, including SSR 88–13 factors discussed *infra* pp. 1284. *See* 20 C.F.R. § 404.1529(c)(incorporating SSR 88–13); 56 Fed.Reg. 57928, 11/14/91 (SSR 88–13 incorporated into federal regulations). At least one circuit has held that, because the regulations were intended to incorporate prior Social Security Administration policy, they should be applied retroactively. *See Pope v. Shalala,* 998 F.2d 473, 483 (7th Cir.1993). We need not decide the issue of retroactivity because the new regulations are consistent with the Commissioner's prior policies and with prior Ninth Circuit caselaw, both of which clearly apply here.

§ 423(d)(5)(A) (1988)); *Cotton*, 799 F.2d at 1407–08. The *Cotton* test imposes only two requirements on the claimant: (1) she must produce objective medical evidence of an impairment or impairments; and (2) she must show that the impairment or combination of impairments *could reasonably be expected to* (not that it did in fact) produce some degree of symptom.

The claimant need not produce objective medical evidence of the pain or fatigue itself, or the severity thereof. *Bunnell*, 947 F.2d at 347–48. Nor must the claimant produce objective medical evidence of the causal relationship between the medically determinable impairment and the symptom. *Id.* at 345. By requiring that the medical impairment "could reasonably be expected to produce" pain or another symptom, the *Cotton* test requires only that the causal relationship be a reasonable inference, not a medically proven phenomenon. *See Howard v. Heckler*, 782 F.2d 1484, 1488 (9th Cir.1986) ("[W]e have never required that the medical evidence identify an impairment that would make the pain inevitable.").

Finally, the claimant need not show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom. *Orteza*, 50 F.3d at 749–50; *Fair v. Bowen*, 885 F.2d 597, 601 (9th Cir.1989). This approach reflects the highly subjective and idiosyncratic nature of pain and other such symptoms. *See, e.g., Cotton*, 799 F.2d at 1407; *Fair v. Bowen*, 885 F.2d at 601. "The amount of pain caused by a given physical impairment can vary greatly from individual to individual." *Fair*, 885 F.2d at 601. This is also true for fatigue. Thus, the ALJ may not reject subjective symptom testimony under the *Cotton* analysis simply because there is no showing that the impairment can

reasonably produce the *degree* of symptom alleged.[2]

### 2) *Evidence of underlying impairments.*

Smolen produced uncontradicted objective medical evidence of the following physical impairments existing during the relevant period: (1) loss of one kidney; (2) loss of part of her left lung; (3) mild anemia; (4) suppression of her bone marrow production (as evidenced by anemia); (5) changes in her left lung tissue; and (6) spinal scoliosis.

The ALJ limited his review of the medical records to a search for anemia, scoliosis, back pain, and fatigue. Without explanation, he ignored medical evidence of Smolen's other impairments and thereby erred. *See, e.g., Cotton*, 799 F.2d at 1408–09 (legal error where ALJ's findings completely ignore medical evidence without giving specific, legitimate reasons for doing so). The ALJ also erred by rejecting Smolen's symptom testimony on the ground that her medical charts did not document prior statements corroborating her fatigue and pain; such evidence is not required to satisfy the *Cotton* test.

In addition, the ALJ failed to find Smolen anemic during the relevant period, even though substantial and undisputed evidence supported such a finding. Smolen produced hemoglobin levels demonstrating that she was anemic in 1967 and 1968, after her childhood cancer treatment, and that she was still anemic in 1987, prior to her adult chemotherapy, and thereafter. The fact that Smolen could not produce hemoglobin levels for the interim period does not support the ALJ's failure to find Smolen anemic. Once Smolen produced hemoglobin levels to prove she was anemic in early 1987, SSR 83–20 required the ALJ to consider other evidence to infer the onset date of the anemia. Three physicians, including the ALJ's expert whose testimony the ALJ credited, testified without

---

2. Consistent with the Ninth Circuit's *Cotton* standard is SSR 88–13. SSR 88–13 is a policy statement issued by the Commissioner to assist ALJ's in evaluating subjective symptom testimony. According to that ruling, a claimant alleging pain or other subjective symptoms must show a "medically determinable physical or mental impairment ... that could reasonably be expected to produce the pain [or other symptoms] alleged." SSR 88–13. However, like our case law, SSR 88–13 recognizes that symptoms such as pain are "subjective and not susceptible to measurement by reliable techniques," and therefore does not require objective medical evidence of the symptom itself or the severity thereof.

contradiction that the hemoglobin levels Smolen produced indicated that she likely suffered anemia throughout the period from 1968 to 1987 and thereafter.

### 3) *Causal relationship between impairments and symptoms.*

Smolen offered uncontroverted medical opinions establishing that her medical impairments could reasonably be expected to have caused fatigue and pain.[3] Dr. Harry Smolen stated that Smolen's fatigue could reasonably have resulted from her childhood cancer treatment which, he explained, caused the combination of impairments from which Smolen suffered.[4] Dr. Bert Hoeflich stated that Smolen's fatigue could reasonably have been caused by her childhood chemotherapy and radiation treatment. Finally, although Dr. Winston Maxwell testified that mild anemia *"by itself,"* in an *"otherwise well"* person, would not have caused *disabling* fatigue, (emphasis added), he also indicated that mild anemia by itself would cause some degree of fatigue [5] and that all of Smolen's conditions combined could have been disabling. More specifically, Dr. Maxwell concluded that "a perfectly good hypothesis" is that everything Smolen went through related to her childhood cancer—including "horrendous illness, two major surgeries, chemotherapy and x-ray therapy"—"impaired her ability to function."

Although the evidence showed that Smolen's impairments could reasonably have caused her symptoms, as required by *Cotton,* the ALJ failed to take into account all the evidence and misapplied the *Cotton* test. First, the ALJ focused his questioning of Dr. Maxwell on whether mild anemia *by itself,* in an *otherwise well person,* would have caused the fatigue about which Smolen complained. However, Smolen did not have mild anemia

alone and she was not an otherwise well person. The ALJ ignored the objective medical evidence of Smolen's other impairments and failed to develop the record, as he was required to do, by asking Dr. Maxwell whether the combination of those impairments could reasonably have caused fatigue. *See Brown v. Heckler,* 713 F.2d 441, 443 (9th Cir.1983) (ALJ has special duty to fully and fairly develop record).

Second, the ALJ focused on whether Smolen's impairments could have caused the *severity* of fatigue Smolen alleged; however, Smolen only had to prove that her impairments could reasonably have caused *some* degree of fatigue. *See Fair,* 885 F.2d at 601. As noted above, Dr. Maxwell testified that mild anemia alone would have caused some level of fatigue, just not the degree Smolen alleged. *See supra* p. 1283. Under the *Cotton* test, no more was required. *See supra* pp. 1281–82.

Finally, the ALJ erroneously focused on whether the causal relationship was medically determinable through scientific studies, instead of whether it was reasonable to expect such a relationship. *See Bunnell,* 947 F.2d at 344–45 (test is whether impairment "could reasonably be expected to have caused" the subjective symptom); *Howard,* 782 F.2d at 1488 ("[W]e have never required that the medical evidence identify an impairment that would make the pain inevitable.").

The opinions of these physicians were sufficient to establish that the combination of impairments from which Smolen suffered during this period could reasonably have caused her fatigue and pain, thus satisfying the *Cotton* test.

### b) *Credibility Analysis.*

Once a claimant meets the *Cotton* test and there is no affirmative evidence suggesting

---

**3.** The issue of whether the ALJ could disregard the opinions of these experts is discussed *infra* pp. 1285–88.

**4.** Dr. Smolen explained that Smolen's cancer treatments and surgeries caused her to suffer from chronic anemia, scoliosis, reduced pulmonary functioning, and susceptibility to infection as a result of a decreased white blood cell count,

the combination of which, he implied, in turn caused Smolen's fatigue.

**5.** Dr. Maxwell testified that mild anemia alone would limit a person's ability to "exert herself in a very physical way." He explained that a person with mild anemia alone would have the capability of doing "sedentary work, intellectual work, or moderate physical work."

she is malingering,[6] the ALJ may reject the claimant's testimony regarding the severity of her symptoms only if he makes specific findings stating clear and convincing reasons for doing so. *Dodrill*, 12 F.3d at 918. The ALJ must state specifically which symptom testimony is not credible and what facts in the record lead to that conclusion. *Id.*

To determine whether the claimant's testimony regarding the severity of her symptoms is credible, the ALJ may consider, for example: (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities.[7] *See, e.g., Fair*, 885 F.2d at 602–04; *Orteza*, 50 F.3d at 750; *Bunnell*, 947 F.2d at 346–47. In evaluating the credibility of the symptom testimony, the ALJ must also consider the factors set out in SSR 88–13. *See Bunnell*, 947 F.2d at 346. Those factors include the claimant's work record and observations of treating and examining physicians and other third parties regarding, among other matters, the nature, onset, duration, and frequency of the claimant's symptom; precipitating and aggravating factors; functional restrictions caused by the symptoms; and the claimant's daily activities. *See* SSR 88–13.[8]

According to the ALJ's ultimate findings, he rejected Smolen's complaints of severe fatigue and severe back pain because they were not credible and were not supported by contemporaneous medical evidence. The ALJ also made the following subsidiary findings: (1) that Smolen's daily activities "were quite limited"; (2) that, although Smolen graduated from high school and earned a college certificate, those activities could be compatible with her symptoms; (3) that Smolen was not taking pain medication; and (4) that "contemporaneous medical records contradict severe back pain or dysfunction or severe anemia-based fatigue."

The first of these subsidiary findings supports a finding that Smolen's testimony was credible. The second is not persuasive in either direction.

As to the third, Smolen presented testimony at the hearing that she had not sought treatment (and therefore was not taking medication) for her chronic fatigue and pain because, as a result of not being able to maintain a job, she had no insurance and could not afford treatment. Where a claimant provides evidence of a good reason for not taking medication for her symptoms, her symptom testimony cannot be rejected for not doing so. *See Bunnell*, 947 F.2d at 346; *Fair*, 885 F.2d at 602. Thus, the fact that Smolen was not taking medication is not a clear and convincing reason for discrediting her symptom testimony.

As to the fourth, although Smolen's sparse medical records during the relevant period do not contain prior consistent statements to corroborate Smolen's claims of pain and fa-

---

6. The ALJ made no finding that Smolen was malingering, nor did any of the evidence suggest she was doing so.

7. With respect to the claimant's daily activities, the ALJ may reject a claimant's symptom testimony if the claimant is able to spend a substantial part of her day performing household chores or other activities that are transferable to a work setting. *Fair*, 885 F.2d at 603. As explained in *Fair*, however, this line of reasoning has its limits. The Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits, and many home activities may not be easily transferable to a work environment where it might be impossible to rest periodically or take medication. *Id.*

8. SSR 88–13 directs the ALJ as follows:

[I]t is essential to investigate all avenues presented that relate to subjective complaints, including the claimant's prior work record and information and observations by treating and examining physicians and third parties, regarding such matters as:
1. The nature, location, onset, duration, frequency, radiation, and intensity of any pain [or other symptom];
2. Precipitating and aggravating factors (e.g., movement, activity, environmental conditions);
3. Type, dosage, effectiveness, and adverse side effects of any pain medication;
4. Treatment, other than medication, for relief of pain [or other symptom];
5. Functional restrictions; and
6. The claimant's daily activities.

tigue, nothing in them appears to contradict Smolen's statements, and the ALJ made no finding identifying a contradiction.

Furthermore, "in evaluating a claimant's subjective complaints of pain [or other symptoms], the adjudicator must give full consideration to all of the available evidence, medical *and other*, that reflects on the impairment and any attendant limitations of function." SSR 88–13 (emphasis added). Such other evidence includes the claimant's prior work record, her daily activities, and observations by treating and examining physicians and third parties about the claimant's symptoms and their effects. *See* SSR 88–13, quoted in part at *supra* p. 1284 n. 8. Here, Smolen offered substantial "other" evidence to corroborate her subjective symptom testimony, including her work history; lay testimony from family members regarding her daily activities at home and her ability to function at school; observations of her high school guidance counselor regarding her energy level in school; and opinions and observations from treating and examining physicians.[9] Given this substantial corroborating evidence, the fact that Smolen's few available medical records do not document prior consistent statements regarding her symptoms does not constitute a clear and convincing reason to reject her symptom testimony.

In conclusion, having failed to find clear and convincing reasons for rejecting Smolen's subjective symptom testimony, the ALJ erred in doing so.

2. *Opinions of Treating Physician and Specialist*

 Because treating physicians are employed to cure and thus have a greater opportunity to know and observe the patient as an individual, their opinions are given greater weight than the opinions of other physicians. *Rodriguez v. Bowen*, 876 F.2d 759, 761–62 (9th Cir.1989); *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir.1987). Therefore, an ALJ may not reject treating

physicians' opinions unless he "makes findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir.1989) (quoting *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir.1987)). In addition, if the treating physicians' opinions are uncontroverted, those reasons must be clear and convincing. *Rodriguez*, 876 F.2d at 761–62. Similarly, the opinions of a specialist about medical issues related to his or her area of specialization are given more weight than the opinions of a nonspecialist. *See* 20 C.F.R. § 404.1527(d)(5). *See also Bunnell v. Sullivan*, 912 F.2d 1149, 1153 (9th Cir.1990), *aff'd on reh'g*, 947 F.2d 341 (9th Cir.1991) (en banc).

Smolen produced the opinions of four physicians—Drs. Smolen, Hoeflich, Bowen, and Morich—in support of her application for benefits. Here, we need only consider the ALJ's rejection of the opinions of two of those physicians—Dr. Hoeflich and Dr. Smolen. Dr. Hoeflich was Smolen's treating physician. Dr. Smolen was a specialist in the area of medicine that was most relevant to assessing Smolen's condition—physiatry; both Dr. Morich and Dr. Pesado, one of the ALJ's experts, stated that a physiatrist would be the most appropriate specialist to evaluate Smolen's condition and her residual functional capacity during the years in question. Dr. Smolen was the only physiatrist to give an opinion in this case. Therefore, both Dr. Hoeflich's and Dr. Smolen's opinions were entitled to greater weight than the opinions of Dr. Maxwell—a nontreating, nonexamining internist called by the ALJ. *Rodriguez*, 876 F.2d at 761–62 (opinions of treating physician given greater weight than nontreating physician); *Bunnell*, 912 F.2d at 1153 (opinions of specialist given greater weight than nonspecialist). See also *Pitzer v. Sullivan*, 908 F.2d 502 (9th Cir.1990) (conclusion of nonexamining physician entitled to

---

9. Although SSR 88–13 required the ALJ to consider this evidence in determining whether to accept Smolen's subjective symptom testimony, he failed to discuss much of it, probably because he had erroneously discounted much of it on the

ground that it was offered by Smolen's family members. The issue of whether the ALJ could disregard the lay testimony of Smolen's family members is discussed *infra* pp. 1288–89.

less weight than conclusion of examining physician).

The opinions of both physicians were also uncontroverted. The ALJ appears to have treated Dr. Smolen's and Dr. Hoeflich's opinions as controverted by the testimony of Dr. Maxwell, especially regarding the cause of Smolen's fatigue and its effect on her ability to function. However, this treatment was erroneous. Dr. Smolen and Dr. Hoeflich opined that Smolen's fatigue could reasonably have resulted from Smolen's childhood radiation treatment and chemotherapy and that the fatigue and related conditions would have made it impossible for her to have sustained "even sedentary work" on a full-time basis beginning before November 1, 1982, and continuing thereafter. As previously noted, Dr. Maxwell, while ruling out mild anemia *"by itself"* in an *"otherwise well"* person as a cause of disabling fatigue, also testified that a perfectly good hypothesis is that everything Smolen went through related to her childhood cancer—including "horrendous illness, two major surgeries, chemotherapy and x-ray therapy"—"impaired her ability to function." That testimony was consistent with Dr. Smolen's and Dr. Hoeflich's opinions.

In addition, the three physicians agreed that it was reasonable to infer from available lab reports that Smolen had anemia beginning before November 1, 1982, and continuing ever since. And, Dr. Smolen and Dr. Maxwell agreed that Smolen suffered from at least mild bone marrow suppression, which could possibly have caused her to be susceptible to viral infections.

▆▆ Accordingly, the opinions of Drs. Smolen and Hoeflich were uncontroverted opinions entitled to great weight. Moreover, because Dr. Hoeflich's opinions were the uncontroverted opinions of a treating physician, the ALJ could reject those opinions only on the basis of specific, clear and convincing reasons, supported by substantial evidence. *See supra* p. 1285. With those principles in mind, we now examine the ALJ's rejection of Dr. Hoeflich's and Dr. Smolen's opinions.

In denying Smolen's application for disabled child's benefits, the ALJ discussed only the opinions Dr. Smolen and Dr. Hoeflich offered in response to four questions Smolen's counsel posed to them; he did not discuss the opinions Dr. Smolen and Dr. Hoeflich offered in other letters. By disregarding those opinions and making contrary findings, he effectively rejected them. His failure to offer reasons for doing so was legal error.

The ALJ also rejected the opinions he did discuss. Those opinions were offered in response to a letter in which Smolen's counsel summarized relevant evidence in the record and applicable legal standards and asked four questions. Dr. Hoeflich and Dr. Smolen both answered "yes" to each question and Dr. Smolen added explanations for his answers. The ALJ stated that those opinions were "not entitled to much weight" and ultimately rejected them entirely by making contrary findings. The ALJ offered the same reasons for rejecting both physicians opinions.

The first reason the ALJ gave for rejecting Dr. Smolen's and Dr. Hoeflich's responses was that they were based on a "somewhat biased and incomplete" summary of the evidence and therefore were themselves somewhat biased and incomplete. However, the summary prepared by counsel generally reflected the evidence in the record accurately. The summary was neither materially incomplete nor improperly inclusive.

Regarding incompleteness, the ALJ stated generally that the summary omitted facts from which contrary inferences could have been drawn. But he failed to explain what those inferences would have been and in what way they would have been contrary to the opinions the physicians offered. Upon review of the omitted facts about which the ALJ was concerned, it appears that each of those facts was either implicit in other facts set out in the summary of evidence or was immaterial to the questions or physicians' responses. We address each of these omitted facts.

First, the ALJ pointed out that the summary did not mention that Smolen graduated from high school in 1980. However, the summary did state that Smolen attended community college, which implies she graduated from high school. The ALJ also noted that the summary omitted that Smolen "completed a course and was certified as a CNA

[Certified Nurses' Aide]." However, the summary stated that Smolen worked two jobs as a CNA, which implies that she completed a course and was certified as a CNA.

Second, the ALJ stated that the summary omitted that Smolen graduated 170th out of 238 in her high school class. However, the summary gave complete information about Smolen's activities during the relevant period-including her attendance at community college starting in the Fall of 1982, her grade point average and attendance record in college, and detailed information regarding her work history from May 1982 through 1987. Nothing suggests that knowledge of Smolen's high school class rank would have changed the opinions Dr. Smolen and Dr. Hoeflich offered, especially given that the rank was low.

Third, the ALJ noted that the summary omitted the fact that Smolen had not been tested for anemia between 1982 and 1987 and possibly wrongly implied that she had been tested during that period, but that the records had been destroyed. However, the only information material to the questions asked was that there were no records showing Smolen's hemoglobin levels between 1968 and 1987; the summary accurately stated that fact. The reason for the gap in the records was immaterial.

Finally, the ALJ noted that the summary omitted the fact that there was a 16–year gap in Smolen's medical records[10] and included only selected medical records. Regarding the 16–year gap, the ALJ's main concern was that there were no medical records during that period documenting Smolen's complaints of disabling fatigue or her anemia. However, the physicians' responses did not address whether Smolen had *in fact* experienced the fatigue she alleged; if they had, a lack of

medical records documenting complaints of fatigue might have been relevant. Moreover, the questions directed to the physicians regarding anemia were specifically premised on the gap in records documenting hemoglobin levels. Regarding the inclusion of only selected medical records, the ALJ failed to point to anything in the omitted records that might have led to different responses to any of the four questions and our examination of the records has disclosed nothing.

Other than omitted facts, the ALJ's only other specific concern related to bias was that the summary was a "legal medical argument ... including even citations to Social Security Rulings and a discussion of the claimant's work history and quotations from portions of her doctor's opinions." However, Smolen's work history, the opinions of other physicians, and applicable legal standards were relevant to her claim and thus properly provided to the expert witnesses to enable them to fully understand the questions they were asked.

The second reason the ALJ gave for rejecting Dr. Smolen's and Dr. Hoeflich's opinions was that the questions to which they responded contained unsubstantiated assumptions. The ALJ cited only one example of an unsubstantiated assumption: "that the claimant was so fatigued by anemia that she could not function during the relevant period." But Smolen's counsel did not ask Dr. Smolen and Dr. Hoeflich to assume that Smolen's fatigue resulted from anemia, or that Smolen's fatigue prevented her from functioning. Instead, he asked them to assume, for the purpose of question one, that Smolen suffered the fatigue she alleged and, for the purpose of question four, that she suffered that fatigue and other impairments related to her childhood cancer. These assumptions were fully substantiated.[11]

---

10. The 16–year gap in the records refers to the years between Smolen's cancers. During that time, Smolen saw her physicians infrequently, with several years passing between visits after 1975. At Smolen's first hearing, she presented no medical records for the period between approximately December 1971 and February 1987. By the second hearing, Smolen and the ALJ's hearing assistant recovered the existing medical records. However, the records were sparse and contained little information helpful to resolving the issues in this case.

11. The ALJ's finding that the assumption of fatigue was unsubstantiated resulted from his rejection of Smolen's subjective symptom testimony and the lay testimony that supported it. However, the ALJ erred in rejecting that evidence. *See supra* pp. 1281–85; *infra* pp. 1288–89. Also, Smolen produced ample documentation of her underlying medical impairments. *See supra* p. 1282.

The third reason the ALJ gave for rejecting Dr. Smolen's and Dr. Hoeflich's responses was that the questions were leading and called for only yes-or-no, "check-the-box" answers. However, the use of leading, hypothetical questions to elicit expert opinions is entirely appropriate. *See* Fed.R.Evid. 703, Notes of Advisory Committee on 1972 Proposed Rules. Moreover, the questions called not only for yes-or-no answers, but also for comments from the physicians in support of their answers. Dr. Smolen's responses were accompanied by comments explaining the reasons for each of his responses. Those comments do not reflect that they are based on assumptions derived from counsels summary or questions; on the contrary, they appear to be based on Dr. Smolen's knowledge of his sister's medical history and his experience in his specialty.

Dr. Hoeflich, on the other hand, did not provide comments to support his answers and did not testify at the hearing. Therefore, the ALJ did not know the basis for Dr. Hoeflich's opinions and thought that they might have been based on unwarranted assumptions. As a preliminary matter, we note that Dr. Hoeflich's responses are cumulative to Dr. Smolen's and not necessary to support Smolen's claim. However, the ALJ still could not reject those responses without clear and convincing reasons for doing so.

■ "In Social Security cases the ALJ has a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered." *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir.1983). This duty exists even when the claimant is represented by counsel. *Id.* If the ALJ thought he needed to know the basis of Dr. Hoeflich's opinions in order to evaluate them, he had a duty to conduct an appropriate inquiry, for example, by subpoenaing the physicians or submitting further questions to them. *See* 42 U.S.C. § 405(d)(1988); 20 C.F.R. § 404.950(d)(1991); 20 C.F.R. § 404.1527(c)(3). He could also have continued the hearing to augment the record. *See* 20 C.F.R. § 404.944 (1991). Having failed to fully develop the record regarding the basis for Dr. Hoeflich's opinions, the ALJ could not then reject those opinions—which were

uncontroverted and corroborated—because they were given in response to leading, hypothetical questions.

In conclusion, we find that the reasons the ALJ gave for rejecting Dr. Smolen's testimony were not supported by substantial evidence in the record. Given that Dr. Smolen was an appropriate specialist who offered significant explanations for each of his opinions, we find that the ALJ's rejection of Dr. Smolen's testimony without substantiated grounds for doing so constituted legal error. In addition, we find that the ALJ rejected Dr. Hoeflich's opinions without clear and convincing reasons for doing so; therefore, such rejection constituted reversible error. *See Cotton*, 799 F.2d at 1408.

### 3. *Testimony Offered by Smolen's Family Members*

Disregard of the testimony of friends and family members violates 20 C.F.R. § 404.1513(e)(2)(1991). *Sprague*, 812 F.2d at 1232; *Dodrill*, 12 F.3d at 918. According to that regulation, the Commissioner will consider observations by nonmedical sources about how impairments affect a claimant's ability to work. *See* 20 C.F.R. § 404.1513(e)(2). More specifically, the Commissioner's Rulings require the ALJ to consider lay witness testimony in certain types of cases. SSR 88–13 states that where a claimant alleges pain or other symptoms that are "*not supported by medical evidence in the file*, the adjudicator *shall* obtain detailed descriptions of daily activities by directing specific inquiries about the pain and its effects to ... third parties who would be likely to have such knowledge." SSR 88–13 (emphasis added). The ruling then requires the ALJ to give "full consideration" to such evidence. *Id.* Having been directed to consider the testimony of lay witnesses in determining a claimant's disability, the ALJ can reject the testimony of lay witnesses only if he gives reasons germane to each witness whose testimony he rejects. *Dodrill*, 12 F.3d at 919.

■ Here, Smolen's alleged disability is based on fatigue and pain. Her medical records are sparse and do not provide adequate documentation of those symptoms.

Under SSR 88–13, the ALJ therefore had to consider the testimony of Smolen's family members, as lay witnesses, regarding her symptoms. Instead, he rejected that testimony.

The first reason the ALJ gave for doing so was that the testimony was from "family witnesses" who were therefore "understandably advocates, and biased." This amounted to a wholesale dismissal of the testimony of all the witnesses as a group and therefore does not qualify as a reason germane to each individual who testified. Moreover, the same could be said of any family member who testified in any case. The fact that a lay witness is a family member cannot be a ground for rejecting his or her testimony. To the contrary, testimony from lay witnesses who see the claimant every day is of particular value, *see Dodrill,* 12 F.3d at 919 ("[a]n eyewitness can often tell whether someone is suffering or merely malingering ... this is particularly true of witnesses who view the claimant on a daily basis ..."); such lay witnesses will often be family members.

The second reason for rejecting the testimony of Smolen's family members was that "medical records, including·chart notes made at the time, are far more reliable and entitled to more weight than recent recollections made by family members and others, made with a view toward helping their sibling in pending litigation." Contrary to the testimony of Smolen's family members, the ALJ concluded that, because Smolen's medical records through 1987 did not reflect symptoms of fatigue and severe back pain, it was "simply beyond belief that Smolen suffered such fatigue ... back pain and dysfunction during her 14–year gap between her two severe bouts of cancers...." The rejection of the testimony of Smolen's family members because Smolen's *medical records did not corroborate her fatigue and pain* violates SSR 88–13, which directs the ALJ to consider the testimony of lay witnesses where the claimant's alleged symptoms are *unsupported* by her medical records. *See* SSR 88–13 (where "allegation [of subjective symptom] is not supported by objective medical evidence in the file, the adjudicator shall obtain de-

tailed descriptions of daily activities by directing specific inquiries about the [symptom] and its effects to ... third parties who would be likely to have such knowledge.").

Thus, the ALJ erred in rejecting the testimony of Smolen's family members.

B. *Substantial Evidence Does Not Support the ALJ's* Findings

 "The claimant has the burden of proving that she is disabled." *Cotton,* 799 F.2d at 1405. "A claimant establishes a prima facie case of disability by showing that her impairment prevents her from performing her previous occupation." *Id.* Once the claimant establishes a prima facie case, "the burden then shifts to the Commissioner to show that the claimant can perform other types of work that exist in the national economy, given her residual functional capacity, age, education, and work experience." *Id.;* 20 C.F.R. §§ 404.1505(a), 404.1520(f), 404.1560–.1568 (1991).

To determine whether a claimant is disabled, the Commissioner conducts a five-step sequential inquiry. *See Bowen v. Yuckert,* 482 U.S. 137, 140–42, 107 S.Ct. 2287, 2290–92, 96 L.Ed.2d 119 (1987); 20 C.F.R. § 404.1520(b)-(f)(1991). In conducting this inquiry, the Commissioner asks five questions in order until a question is answered in such away that the claimant is conclusively determined disabled or not. *See id.* Because Smolen satisfied the *Cotton* test and the ALJ failed to offer clear and convincing reasons to reject her symptom testimony, the ALJ was required to consider Smolen's severe fatigue and her back pain in determining whether Smolen's impairments were severe at step two and in determining Smolen's residual functional capacity to perform work at step five. *See* SSR 88–13; *see also* 20 C.F.R. § 404.1529(d) (effective 11/14/91)(adopting SSR 88–13). The ALJ's step-two and step-five findings, which led to the ALJ's ultimate finding that Smolen was not disabled during the relevant period, are at issue here.

1. *The ALJ's Step–Two Determination*

At step two of the five-step sequential inquiry, the Commissioner determines

whether the claimant has a medically severe impairment or combination of impairments. *Yuckert,* 482 U.S. at 140–41, 107 S.Ct. at 2290–91. The Social Security Regulations and Rulings, as well as case law applying them, discuss the step two severity determination in terms of what is "not severe." According to the Commissioner's regulations, "an impairment is not severe if it does not significantly limit [the claimant's] physical ability to do basic work activities," 20 C.F.R. §§ 404.1520(c), 404.1521(a)(1991). Basic work activities are "abilities and aptitudes necessary to do most jobs, including, for example, walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling." 20 C.F.R. § 140.1521(b); Social Security Ruling 85–28 ("SSR 85–28").

■ Important here, at the step two inquiry, is the requirement that the ALJ must consider the combined effect of all of the claimant's impairments on her ability to function, without regard to whether each alone was sufficiently severe. *See* 42 U.S.C. § 423(d)(2)(B)(Supp. III 1991); Social Security Ruling 868 ("SSR 86–8"). *See also* SSR 85–28. Also, he is required to consider the claimant's subjective symptoms, such as pain or fatigue, in determining severity. SSR 88–13; 20 C.F.R. § 404.1529(d)(2)(effective 11/14/91) (adopting SSR 88–13). Finally, the step-two inquiry is a de minimis screening device to dispose of groundless claims. *Bowen v. Yuckert,* 482 U.S. at 153–54, 107 S.Ct. at 2297–98. An impairment or combination of impairments can be found "not severe" only if the evidence establishes a slight abnormality that has "no more than a minimal effect on an individuals ability to work." *See* SSR 85–28; *Yuckert v. Bowen,* 841 F.2d 303, 306 (9th Cir.1988)(adopting SSR 85–28).

■ In this case, the ALJ found Smolen to suffer from only one severe impairment, namely, a "slight scoliosis" which resulted "in [Smolen's] self-described inability to walk more than 1/2 hour at a time or sit more than one hour at a time." In so finding, the ALJ ignored substantial and undisputed evidence of Smolen's other impairments and failed to consider how the *combination* of those impairments affected Smolen's ability to do basic work activities. Having improp-

erly rejected the testimony of Smolen and her family regarding her fatigue and pain, the ALJ also failed to consider her subjective symptoms in making the severity determination.

As previously noted, the evidence in the record established that Smolen suffered loss of one kidney, loss of part of her left lung, changes in her remaining lung tissue, mild anemia, suppression of her bone marrow production, and spinal scoliosis. Undisputed evidence in the record supports that, as a result of these impairments, Smolen suffered severe fatigue and back pain. Those symptoms inhibited her ability to do basic work activities such as walking, standing, sitting, lifting and carrying. Smolen could not walk for more than one-half hour without stopping to rest for 10 or 15 minutes; she could not walk up and down one flight of stairs without becoming fatigued; she could not sit for more than one hour or stand for more than one-half hour without experiencing back pain and fatigue; and she became fatigued when sitting if she had to do "strenuous activities" such as typing or sewing. In previous jobs, Smolen had difficulty pushing a mail cart, carrying files, and carrying and lifting books for reshelving in a library. Because of these limitations, Smolen was either fired from or quit four different jobs.

This evidence establishes that the combination of Smolen's impairments constituted more than a "slight abnormality" that had "no more than a minimal effect on her ability to do work"; this is all that Smolen needed to show to prove severity at step two. *See supra* p. 1290. Thus, the ALJ's finding that Smolen suffered only one severe impairment—and, implicitly, that the combination of her other impairments was "not severe"— is not supported by substantial evidence.

Having found Smolen to suffer from only one "severe" impairment at step two, the ALJ necessarily failed to consider at step five how the combination of her other impairments—and resulting incapacitating fatigue—affected her residual functional capacity to perform work. *See infra.*

### 2. The ALJ's Step–Five Determination

By step five of the five-step sequential inquiry, the burden shifts to the Commissioner to prove that, based on the claimant's residual functional capacity, age, education, and past work experience, she can do other work. *Bowen v. Yuckert*, 482 U.S. at 142, 107 S.Ct. at 2291–92, 20 C.F.R. § 404.1520(f). If she can, she is not disabled; if she cannot, she is disabled. *Id.*

At issue here is whether Smolen had the residual functional capacity to perform other work. A claimant's "residual functional capacity" is what a claimant can still do despite her limitations. 20 C.F.R. § 404.1545(a) (1991). Where those limitations are physical, the Commissioner "considers [the claimant's] ability to do various physical activities" walking, standing, lifting, carrying, pushing, pulling, reaching, handling and "evaluates other physical functions" to determine the claimant's "residual functional capacity for work activity on a regular and continuing basis." 20 C.F.R. § 404.1545(b) (1991). In determining residual functional capacity, the ALJ must consider subjective symptoms such as fatigue and pain. *See* SSR 88–13; 20 C.F.R. § 404.1529(d) (effective 11/14/91) (adopting SSR 88–13).

Here, the ALJ found that Smolen "had the residual functional capacity to perform the requirements of work between November 1, 1982 and early 1987, except for her inability to walk more than 1/2 hour at a time or sit more than one hour at a time." Moreover, the ALJ found that, considering Smolen's age, education, work experience, and intelligence tests, she could perform a significant number of sedentary jobs in the national economy. Therefore, the ALJ found Smolen not disabled and not entitled to child's disability insurance benefits.

In support of her application for benefits, Smolen offered extensive testimony, including her own and her family members, regarding her severe fatigue and back pain and the effect they had on her ability to function. Dr. Smolen and Dr. Hoeflich opined that, as a result of these symptoms, Smolen would have been unable to perform even sedentary work on a full-time basis during the material time period. These opinions are supported by the rest of the record. For example, Smolen and her family members testified that, during the relevant period, Smolen needed to take naps during the day and fatigued easily even when doing such sedentary activities as typing and sewing. Moreover, Smolen's school and work history demonstrated that, as a result of her fatigue and frequent viral infections, Smolen could not maintain regular attendance in high school or college or at work. The vocational experts both stated that Smolen could not have maintained even a sedentary job with that kind of attendance record.

There is no contradictory evidence and none to support the ALJ's finding that Smolen could have performed a full-time sedentary job during the years in question. Although the ALJ appears to have relied on the testimony of Dr. Maxwell and Patricia Lesh, the ALJ's vocational expert, to support his findings, neither testified that she had the residual functional capacity to perform a full-time sedentary job.

As noted, Dr. Maxwell testified that considering the overall effects of Smolen's childhood cancer and treatment, Dr. Maxwell testified that "a perfectly good hypothesis" is that those effects "impaired her ability to function." He suggested that, aside from whether Smolen had the physical stamina to work a sedentary job, her mental fatigue might have prevented her from doing such work.

Lesh's testimony also fails to support the ALJ's finding. Lesh disclaimed any opinion regarding whether Smolen had the physical capacity to perform sedentary work. Additionally, when the ALJ asked Lesh whether the jobs she had listed would cause fatigue, she testified that "what would cause one person fatigue may not another ... So it's purely a subjective situation as to what one person experiences versus another as far as fatigue is concerned." While Lesh testified that the jobs she listed were sedentary in nature and did not require physical exertion such as lifting, as previously noted, Smolen became fatigued even when doing sedentary activity such as typing or sewing. *See supra* p. 1291.

Finally, although Smolen managed to graduate from high school and attend college, her fatigue regularly caused her to fall asleep in class or to miss class completely. Such effects would have prevented Smolen from maintaining even a sedentary full-time job.

Considering the record as a whole, including the evidence the ALJ erroneously discredited, we conclude that the ALJ's finding that Smolen could have performed sedentary work is not supported by substantial evidence. Instead, the overwhelming evidence to the contrary required the ALJ to find Smolen disabled.

### III. *Remand for Award of Benefits*

■ We have discretion to remand a case either for additional evidence and findings or to award benefits. *Swenson,* 876 F.2d at 689. We may direct an award of benefits where the record has been fully developed and where further administrative proceedings would serve no useful purpose. *Id.*

In the past, we have credited evidence and remanded for an award of benefits where (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited. *See Rodriguez v. Bowen,* 876 F.2d 759, 763 (9th Cir.1989) (crediting treating physician's uncontroverted testimony and awarding benefits); *Swenson,* 876 F.2d at 689 (crediting subjective symptom testimony and awarding benefits); *Varney v. Secretary of Health & Human Servs.,* 859 F.2d 1396, 1401 (9th Cir.1988) (same).

■ In this case, the ALJ's reasons for discrediting Smolen's subjective symptom testimony, the physicians' opinions, and the lay testimony were legally insufficient. There are no outstanding issues to preclude us from making a disability determination on the merits. The record is fully developed and, considering the evidence that the ALJ improperly discredited, a finding of disability is clearly required. Smolen has already waited over seven years for her disability determination, and additional proceedings would only delay her receipt of benefits. Therefore, we find that Smolen was disabled throughout the relevant period, and reverse and remand for determination of benefits.

REVERSE and REMAND. Costs to Appellant.

FERGUSON, Circuit Judge, dissenting:

Catherine A. Smolen appeals from the judgment of the district court affirming the determination by the Secretary of Health and Human Services ("Secretary") that she is not entitled to disabled child insurance benefits pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 416 and 423. She contends that the finding of the Administrative Law Judge ("ALJ") that she was not continuously disabled between 1982, when she reached the age of 22, and 1987, when she was undisputedly disabled, was not supported by substantial evidence. She also contends that the Secretary failed to prove that she could perform other work.

To be entitled to disabled child's benefits, Smolen was required to establish disability beginning prior to her twenty-second birthday, on November 1, 1982, and continuing for at least a twelve-month period. 42 U.S.C. § 402(d)(1)(B)(ii). In order to establish disability, Smolen had to demonstrate "an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The ALJ determined that Smolen was not disabled between 1982 and 1987.

Smolen's primary basis for arguing that the ALJ's disability determination was not supported by substantial evidence is that the ALJ discounted her subjective testimony, as well as the testimony of her family, about her fatigue and pain during the relevant period. There were "no associated objective findings" to support the testimony of Smolen and her family. *Magallanes v. Bowen,* 881 F.2d 747, 755 (9th Cir.1989) (claimant must support subjective testimony about pain with objective medical findings establishing medical im-

pairments reasonably expected to produce such pain). Smolen did not visit any doctors for treatment of these conditions during the relevant time period. *See Fair v. Bowen,* 885 F.2d 597, 603 (9th Cir.1989) (claimant's failure to seek treatment with no good reason can cast doubt on the sincerity of the claimant's paid testimony). The ALJ correctly discredited this testimony.

Smolen also argues that the ALJ's disability determination lacked the support of substantial evidence, because the ALJ credited the testimony of the medical expert who did not examine or treat Smolen, while disregarding letters from Smolen's pediatrician and of her physician brother. Neither Smolen's pediatrician nor her brother was her treating physician between 1982 and 1987, and neither were subject to cross examination. Judge Michael Hogan, the district court judge, found with regard to the pediatrician that "Under the circumstances of this case, Dr. Hoeflich can hardly be regarded as plaintiff's 'treating physician.'" Moreover, both gave "brief and conclusionary" opinions as to whether Smolen was disabled during that period; their opinions had "little in the way of clinical findings to support" them. *Magallanes,* 881 F.2d at 751. The ALJ was correct in crediting the testimony of the medical expert who was subject to cross examination.

Smolen's second contention on appeal is that the Secretary failed to prove that she could perform other work, because the ALJ failed to include all of Smolen's limitations when posing hypothetical questions to the vocational expert. However, the ALJ corrected this error by later posing hypothetical questions that did take account of all of Smolen's limitations. This correction was sufficient to allow the Secretary to carry its burden.

I therefore dissent.