**John P. BERGSTAD, Plaintiff,**

v.

**COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION, Defendant.**

**Civil No. 96–6236–JO.**

United States District Court, D. Oregon.

June 24, 1997.

Michael Allen Keeney, Marion–Polk Legal Aid Service, Inc., Salem, OR, for Plaintiff.

Craig J. Casey, Assistant United States Attorney, District of Oregon, United States Attorney's Office, Portland, OR, Richard Wetmore, Office of General Counsel, Social Security Administration, Seattle, WA, for Defendant.

## OPINION AND ORDER

ROBERT E. JONES, District Judge:

Claimant John P. Bergstad seeks judicial review of a final decision of the Commissioner[1] of the Social Security Administration denying him disability insurance benefits (SSD) and Supplemental Security Income (SSI) benefits. This court has jurisdiction to review the Commissioner's decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). Following a careful review of the record, I vacate that decision and remand to the Social Security Administration for reconsideration consistent with this opinion.

## ADMINISTRATIVE HISTORY

This review arises from claimant's third application for SSD and SSI benefits.

Claimant first filed for SSD and SSI on November 7, 1989 [the 1989 claim], claiming disability from upper back pain, lower neck pain, right forearm weakness and unstable angina dating from August 14, 1986. The Social Security Administration found, on February 16, 1990, that claimant was capable of working without restrictions.

Claimant again filed for SSI and SSD on December 14, 1990 [the 1990 claim], with an

SSI protective filing date of October 29, 1990, claiming disability from emphysema and heart disease dating from August 14, 1986. The Social Security Administration denied claimant's application initially and upon reconsideration.

Claimant filed for the third time on June 14, 1993 [the 1993 claim], with an SSI protective filing date of April 6, 1993, claiming disability from lower back injury, neck, forearm and chest pain and emphysema. The Social Security Administration denied claimant's application initially and upon reconsideration. Claimant timely requested a hearing before an Administrative Law Judge (ALJ), which was held on January 10, 1995. Claimant appeared but was not represented by counsel.

The ALJ heard testimony from the claimant, a medical expert, and a vocational expert. On April 27, 1995, the ALJ issued a decision finding plaintiff not disabled and denying benefits. The denial became the final decision of the Commissioner on July 16, 1996, when the Appeals Council declined to review the ALJ's decision.

## STANDARD OF REVIEW

This court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence on the record as a whole. "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Tylitzki v. Shalala,* 999 F.2d 1411, 1413 (9th Cir.1993). The court must weigh "both the evidence that supports and detracts from the [Commissioner's] conclusion." *Martinez v. Heckler,* 807 F.2d 771, 772 (9th Cir.1986). The Commissioner's decision must be upheld if it is a rational interpretation of the evidence, even if there are other possible rational interpretations. *Magallanes v. Bowen,* 881 F.2d 747, 750 (9th Cir.1989).

## SUMMARY OF THE ALJ'S FINDINGS

Although claimant alleges that his disability began August 14, 1986, the ALJ decided

---

1. The court notes that since claimant filed this case, John J. Callahan has replaced Shirley Chater as Commissioner of the Social Security Administration. References to the Commissioner in this opinion reflect that change.

as an initial matter that he would only consider claimant's status after December 11, 1991 because the Social Security Administration had previously found that the claimant was not disabled at any time from August 14, 1986 through December 11, 1991 and because the claimant failed to present grounds that would warrant reconsideration of that prior decision.

To evaluate claimant's alleged disability *after* December 11, 1991, the ALJ employed a five-step "sequential evaluation" process in evaluating claimant's disability, as required. See 20 C.F.R. §§ 404.1520 and 416.920. The ALJ, in step one, determined that claimant had not engaged in substantial gainful work activity at any time since December 12, 1991 and that claimant's insured status for purposes of disability insurance benefits expired on December 31, 1993.

In step two, the ALJ found that claimant had collectively "severe" impairments in the form of depression, mixed personality disorder, emphysema, a history of alcohol and polysubstance abuse in long-term remission, back pain and other orthopedic problems, and fatigue.

In step three, the ALJ found that claimant's impairments, while severe within the meaning of the applicable regulations, did not meet or equal, either individually or in combination, the requirements of any impairment in the Listing of Impairments at 20 C.F.R. Part 404, Subpart P, Appendix 1.

In step four, the ALJ found that the claimant had a residual functional capacity to perform light and sedentary work but noted that claimant must avoid environments with increased levels of airborne particulate matter, such as dust, fumes, solvents, and other substances that might exacerbate claimant's emphysema. In addition, because of the combined effects of claimant's depression and personality disorder, the ALJ found that claimant was limited to simple repetitive work involving simple written oral instructions and low stress and should avoid jobs requiring extensive contact with co-workers or the public.

Finally, in step five, the ALJ found that claimant's impairments did not preclude him from doing his past relevant work of electronics assembly and that claimant possessed residual functional capacity to perform other jobs commonly found in the economy, including small products assembly and hand packaging. The ALJ's conclusions in step five were based upon the vocational expert's evaluation at the hearing of a hypothetical claimant's residual functional capacity. The hypothetical claimant was a forty-three year old, high school graduate, with auto repair training, technical training, and vocational experience in retail store management, auto painting, cannery work and electronics assembly. The hypothetical also included the following limitations: no physical exertion beyond light and sedentary work, no job settings that expose worker to respiratory irritants that could affect emphysema, no jobs with complex written or oral instructions and no jobs with prolonged public contact or intensive worker interaction.

Based upon the five step evaluation, the ALJ determined that claimant was not disabled, as defined in the Social Security Act, at any time between December 11, 1991 and April 27, 1995, the date of the ALJ's opinion.

## FACTS

At the time of the administrative hearing, claimant was 43 years old and had a high school diploma, an Associate's Degree in auto rebuilding and refinishing, and past relevant work experience in auto body repair, retail sales, and food processing. Claimant alleged disability since August 14, 1986 due to a variety of impairments, including emphysema, upper back and neck pain, heart problems, depression and right forearm impairment.

Claimant's present medical problems began in May 1986 after he sustained an injury to his right forearm while working at a cannery. Claimant first saw a doctor, who placed him on light duty, and later consulted an orthopedic surgeon, who placed the arm in a cast.

About the same time, claimant also began to experience chest and neck pain. He was evaluated at the Veteran's Administration Medical Center (VAMC) in Portland, Oregon on several occasions following the onset of

chest pain. The examining physicians found no evidence of heart attack and diagnosed claimant as probably suffering from anxiety-induced angina. Claimant continued to experience subjective pain in his chest and arm and went on medical leave August 14, 1986.

Claimant again sought examination at the Portland VAMC on May 21, 1987, complaining of stabbing chest pains, which began without apparent cause and lasted from fifteen seconds to fifteen minutes. On June 25, 1987, a cardiologist at Portland VAMC evaluated claimant and found nothing wrong. Claimant underwent a diagnostic coronary angiography July 7, 1987. Based on claimant's normal angiogram, the cardiologist diagnosed angina and discharged claimant July 9, 1987.

In September 1987, Dr. William Mayhall treated claimant for pain in his right wrist, which he reportedly re-injured while working at the Norpac # 7 cannery in August 1987. Tests showed diminished grip strength in claimant's right hand. However, neurological study of the right hand and arm performed September 9, 1987 showed normal nerve and muscle function.

In January 1988, Dr. Mayhall referred claimant to the Industrial Medicine Program at Salem Hospital for evaluation and work hardening. Claimant completed thirteen days of physical therapy and was pronounced physically capable of light-medium work. His examining psychologist, Dr. Leslie Pitchford, concluded that claimant's primary disability was psychiatric. Dr. Pitchford diagnosed claimant as suffering from severe depression and provisionally diagnosed Atypical Somatoform Disorder and Atypical Personality Disorder. However, Dr. Pitchford concluded that a final diagnosis of claimant's psychological impairments was not possible while claimant remained in a state of acute distress.

In April 1988, Dr. Richard Mead saw claimant for psychiatric consultation pursuant to an industrial injury claim. Dr. Mead concluded that claimant was "in full cognitive functioning with a clear sensorium." He further concluded that claimant had used his industrial injury to rationalize his return to drinking. Finally, he noted that claimant's relapse had been brief and was under control at the time of the evaluation.

Dr. Pearce treated claimant on April 7, 1988 for neck and upper back pain resulting from an altercation with his wife a week earlier. Dr. Pearce diagnosed cervical strain with no new motor damage. A subsequent MRI of the neck revealed a "minimal" bulge of the C6–7 disc and otherwise normal musculo-skeletal features. Claimant consulted various doctors at Kaiser Permanente on May 23, June 20 and August 5 and received Motrin to treat his pain symptoms.

Claimant again sought treatment on December 14, 1988, January 27, 1989, and May 2, 1989 for right elbow pain, which began after a police officer bent claimant's arm behind his back in December 1988. His treating physicians diagnosed chronic inflammation of the elbow.

On May 12, 1989, Dr. David N. Sweet, a psychological consultant, examined claimant as part of claimant's vocational rehabilitation (VR) evaluation. Dr. Sweet concluded that claimant's somatic symptoms were "hysterically determined," probably attributable to his depression. Dr. Sweet also suspected claimant of exaggerating the severity of his symptoms.

On July 19, 1989, claimant sought treatment for back and neck pain that began after wrestling with his son. He received Motrin to treat his pain symptoms.

On November 7, 1989, claimant applied for disability insurance benefits for the first time. Pursuant to the application, the Vocational Rehabilitation Division's Disability Determination Services (DDS) conducted a Residual Physical Functional Capacity Assessment, based upon review of claimant's files. DDS concluded that claimant suffered no exertional, postural, manipulative, environmental or other physical limitations. DDS further concluded that claimant's symptoms were disproportionate, in severity and duration, to claimant's medically determinable impairments.

DDS also reviewed claimant's past psychiatric history. Based on that review, the reviewer diagnosed mixed personality disor-

der and substance addiction disorder, in remission. The reviewer ranked claimant's resulting functional limitations ("B" Criteria) as follows: daily living activities, "slight"; difficulties in maintaining social functioning, "slight"; deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner, "seldom"; and episodes of deterioration or decompensation in work, "never."

On February 17, 1990, claimant experienced chest pains that began in the night and recurred during the day while he worked at vocational retraining. Claimant's chest pains resolved without treatment.

On July 13, 1990, Dr. Denker of Kaiser Permanente examined claimant for severe pain in the lower back, which began after claimant moved a pallet while working at the Salem Rehabilitation Foundation. Dr. Denker diagnosed a mild lumbosacral sprain, restricted claimant to light work, and prescribed physical therapy for rehabilitation and Robaxin and Motrin to treat claimant's pain symptoms. On October 2, 1990, Dr. Denker concluded that claimant's back strain was resolved.

Claimant reinjured his lower back and right wrist in December 1990 and February 1991, respectively. X-rays, a NCVT neurological assessment and clinical examination revealed no serious injury. Claimant's treating physicians prescribed Motrin for his pain symptoms.

On December 14, 1990, claimant applied for disability insurance benefits for the second time. Pursuant to the application, DDS again conducted a Residual Physical Functional Capacity Assessment, based upon review of claimant's updated files. DDS concluded that claimant suffered chronic pain but no loss of residual functional capacity.

On August 22, 1991, claimant applied for reconsideration. The Social Security Administration referred claimant to Dr. Ronald Glaus for a psychological assessment. Dr. Glaus conducted a clinical interview with mental status evaluation and reviewed claimant's available health history. Dr. Glaus felt that claimant was cognitively and emotionally capable of sustained work, ranked claimant's

Axis V GAF under the DSM–III–R criteria as a 55, but diagnosed claimant's prognosis as "guarded" because of claimant's depression, marital distress and questionable motivation to work.

Claimant's appeal then went to Dr. Prasanna Pati, of DDS, for review. Dr. Pati diagnosed affective disorder and substance addiction disorder, in remission. Dr. Pati ranked claimant's resulting functional limitations ("B" Criteria) as follows: daily living activities, "slight"; difficulties in maintaining social functioning, "slight"; deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner, "seldom"; and episodes of deterioration or decompensation in work, "never." Following Dr. Pati's recommendation, the SSA denied claimant's December 14, 1990 application for disability insurance benefits.

In February 1992, a friend drove claimant to the Kaiser Emergency Room in Salem, because claimant was complaining of chest pains. The Emergency Room physician diagnosed stable angina and sent claimant home.

In May 1992, claimant sought drug and alcohol treatment from Kaiser Permanente in Salem because he drank several ounces of beer after a prolonged period of abstinence. His treating physician prescribed antabuse and daily counseling through Alcoholics Anonymous, which successfully prevented a relapse.

In 1992, claimant also suffered from lung infection, conjunctivitis and other ailments not at issue in this appeal.

In November and December 1992, claimant underwent a series of evaluations at the Portland VAMC after seeking a non-military service related claim for psychiatric disability. On November 23, Dr. Diane Keller evaluated claimant's complaints of neck, lower back and right arm pain. Specifically, claimant complained of recurrent numbness, tingling and weakness in his arms and hands when attempting physical activity and chronic pain in his lower back. Claimant also reported cramping pain in the right forearm brought on by mild exertion, such as writing, and radiating pain down the back of his legs

after walking or biking. Dr. Keller observed normal musculature and range of motion in the neck, arm and lower back and slightly diminished grip strength in the right arm. She diagnosed claimant as suffering from chronic low back pain due to muscle strain with bi-lateral sciatica and right forearm pain of uncertain etiology.

On November 24, 1992, Dr. Brian Liebreich evaluated patient for psychiatric disorders. Claimant gave a lengthy personal history generally consistent with past personal reports. Based on the November 24 interview, Dr. Liebreich diagnosed claimant as suffering from depression. He speculated that claimant also suffered from personality disorder but deferred diagnosis because claimant's symptoms of depression precluded an accurate diagnosis.

On November 30, 1992, Susan Tomkins, a licensed social worker at the VAMC, evaluated claimant. Based on her interview, Ms. Tomkins concluded that claimant was "quite dysfunctional and severely impaired socially and industrially."

On December 1, 1992, Dr. James J. Biemer performed a general medical exam of claimant. Based on claimant's past records and his own examination, Dr. Biemer found no objective cause of claimant's symptoms. Dr. Biemer then ordered pulmonary function tests, carried out February 10, 1993, which revealed moderate to severe obstruction of claimant's small and large airways. Based on those tests, Dr. Biemer diagnosed plaintiff as suffering from obstructive pulmonary disease.

On June 14, 1993, claimant filed for SSD and SSI a third time, with a protective filing date of April 6, 1993. Pursuant to this claim, Dr. Kevin Moore conducted a physical examination of claimant on August 28, 1993, to investigate his complaints of low back pain, neck pain, chest pain, and right arm dysfunction. Dr. Moore concluded that claimant had no objective neurological or orthopedic findings to suggest why he should not be able to pursue occasional or frequent heavy lifting, no objective reasons to disqualify him from activities requiring neck movements, no limitations in arm use or dexterity, and no other reason that he should not be able to pursue activities requiring good hand-eye coordination and dexterity.

On October 8, 1993, also pursuant to claimant's third application for SSD and SSI, Dr. Glaus performed a psychological assessment of claimant. Dr. Glaus, who had also evaluated claimant in 1991, conducted a clinical interview, including a mental status evaluation, and reviewed claimant's available health history. Dr. Glaus felt that claimant was cognitively and emotionally capable of sustained work, ranking claimant's Axis V GAF under the DSM–III–R criteria as a 55, but diagnosed claimant's prognosis as "guarded" because of claimant's depression, poor self-control, marginal social and vocational adjustments, and low motivation to work.

DDS denied claimant's June 14, 1993 application for SSD and SSI benefits on November 17, 1993. The DDS medical examiners concluded that claimant was limited to repetitive lifting of 25 pounds and occasional lifting up to 50 pounds and that plaintiff should neither sit nor stand for more than six hours in an 8–hour workday. The examiners further concluded that claimant's symptoms were attributable to a medically determinable impairment. The DDS psychiatric examiners diagnosed affective disorders, personality disorders and substance abuse in remission. They ranked claimant's resulting functional limitations ("B" Criteria) as follows: daily living activities, "moderate"; difficulties in maintaining social functioning, "moderate"; deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner, "often"; and episodes of deterioration or decompensation in work, "once or twice." However, the examiners concluded that none of claimant's functional limitations qualified, alone or in combination, as a listed impairment.

On January 11, 1994, claimant requested reconsideration of his June 14, 1993 application.

On February 1, 1994, Dr. Stephen Sullivan performed a psychological assessment of claimant at the request of Adult and Family Services. Dr. Sullivan interviewed the patient and administered an IQ test and the Graham–Kendall Memory for Designs test to

screen for possible neurological impairment. Claimant scored 98 on the IQ test, indicating normal intelligence. Results from the Graham–Kendall test were also normal.

The claimant also took the Minnesota Multiphasic Personality Inventory–2 (MMPI–2) and the Rotter Incomplete Sentences Blank tests for possible psychological disturbance. Dr. Sullivan discounted clinical findings from the MMPI–2 because claimant's score on the validity scale indicated claimant's "marked tendency to endorse items suggestive of severe personal problems." Dr. Sullivan also discounted clinical findings from the Rotter Incomplete Sentences Blank because claimant responded to only 20 of 40 questions. Dr. Sullivan found that claimant's exaggerations were a cry for help, that claimant had a consistent history of personal preoccupation with physical and emotional distress, and that claimant was unable to maintain persistence, concentration, and effort for periods of longer than a half hour. He rated claimant's DSM–III–R, Axis V GAF as a 45 and concluded that claimant was unlikely to experience any major remission in his depression and related symptoms.

On April 8, 1994, the Social Security Administration affirmed its prior decision, apparently without knowledge of Dr. Sullivan's evaluation. On May 31, 1994, claimant requested a hearing before an ALJ.

ALJ John Madden held this hearing on January 10, 1995, taking testimony from medical expert Dr. Prasanna Pati, who had had previous exposure to claimant's health history. The ALJ informed claimant that Dr. Pati reviewed claimant's previous claim, in 1991, and asked whether claimant objected to having Dr. Pati testify as an impartial medical expert. Claimant responded that he did not object.

For the hearing, Dr. Pati prepared a residual functional capacity assessment, based on claimant's medical history, in which he concluded that claimant suffered from affective disorder and personality disorder. Dr. Pati ranked claimant's resulting functional limitations ("B" Criteria) as follows: daily living activities, "slight"; difficulties in maintaining social functioning, "moderate"; deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner, "often"; and episodes of deterioration or decompensation in work, "insufficient evidence." At the hearing, Dr. Pati testified that none of claimant's functional limitations qualified, alone or in combination, as a listed impairment and that claimant was capable of simple, repetitive, low-stress work, preferably with minimal contact with others.

Next, the ALJ asked the vocational expert to summarize claimant's past work experience. The vocational expert testified that claimant had worked as an assistant retail store manager, an auto painter, a cannery worker and an electronics assembler. When asked whether claimant's electronics assembly work, which was done through vocational rehabilitation, should be considered competitive employment, the expert stated that vocational rehabilitation may be competitive. However, the expert felt that the information in the record was inadequate to decide whether this claimant's vocational rehabilitation should qualify as competitive work.

The ALJ then posed a hypothetical to the vocational expert to evaluate. The expert concluded that the ALJ's hypothetical claimant was precluded from cannery work and auto painting but would be able to perform other jobs, including fume-free electronics assembly, small parts assembly and hand packaging of small products. The quantity of those jobs found in Oregon were 1600, 2000 and 500, respectively.

On review here, claimant has supplemented the record of decision with a copy of a November 16, 1995 order from the Oregon Department of Human Resources finding claimant eligible for General Assistance benefits and a copy of a psychological evaluation that Dr. Shane Hayden performed on June 23, 1995. Dr. Hayden concluded that claimant suffered from anxiety and severe depression that have severely impaired his ability to work. Dr. Hayden also noted, however, that claimant overstated his symptoms on the MMPI, Beck Depression and Anxiety scales. Dr. Hayden gave claimant a GAF score of 60, indicating that claimant was capable of working.

## DISCUSSION

Claimant raises five issues. First, he asserts that the ALJ's finding that he had past relevant work experience as an electronics assembler was not based upon substantial evidence. Second, he asserts that the ALJ erred in permitting Dr. Pati, who had previously rendered an opinion on the claimant's disability claim, to testify as a medical expert at the administrative hearing. Third, he alleges that the ALJ erred by partially discounting claimant's excess pain testimony without giving a sufficient explanation. Fourth, he alleges that the ALJ erred in finding no listed impairment due to affective disorder, somatoform disorder or personality disorder because those findings were not based upon substantial evidence. Last, he alleges that the ALJ erred in ignoring the combined impact of claimant's impairments upon his ability to engage in substantial gainful activity. I will address the claims in order.

### A. *Vocational Rehabilitation as Past Relevant Work*

■ Claimant alleges that the ALJ erred in finding that claimant's uncompleted vocational rehabilitation (VR) training in electronics assembly constituted past relevant work. Past work experience is relevant in a disability determination if it was done within the last 15 years, lasted long enough for claimant to learn to do it, involved significant physical or mental activities, and is the kind of work usually done for profit. 20 C.F.R. § 404.1565. Claimant underwent VR training in electronics assembly three to five days a week from September 1989 through September 1990 at the Salem Rehabilitation Foundation, receiving about $100 per month. Electronics assembly is a light occupation, semi-skilled. Claimant's performance level while at the Foundation is unknown. Claimant left his training because smoke and solvents associated with that training made him sick; however, the vocational expert testified that approximately half of the electronics assembly jobs in Oregon do not involve smoke and solvents.

The record contains substantial evidence to support the ALJ's finding that claimant's VR training constituted past relevant work. Claimant's VR training took place within the last 15 years, required significant physical activities (small motor skills), and is the kind of work usually done for profit. One may also infer, from the duration of claimant's training and the modest skill requirements of electronics assembly, that he worked long enough to learn the job. The fact that the record contained no specific facts regarding claimant's pace or accuracy is not critical because claimant's testimony that he left only because of breathing difficulties justifies the ALJ's assumption that claimant achieved a skill level consistent with his training prior to his health-related dismissal. Although the ALJ could better have supported his finding by citing direct evidence that claimant performed satisfactorily during his VR training, the facts that claimant completed 12 months of training for a semi-skilled job and testified that he left only because the fumes in the facility were making him sick provide substantial indirect evidence that claimant has past relevant work experience in electronics assembly.

### B. *Dr. Pati's Testimony at the 1995 Hearing*

#### 1. Conflict of Interest

■ Claimant next alleges that the ALJ erred by allowing expert medical testimony from Dr. Pati, who took part in a State review of claimant's 1991 disability application for the same general impairments. Social Security regulations prohibit all implications of possible conflict of interest between medical professionals who act as consultants to the Social Security Administration and their practices. 20 C.F.R. § 416.919q. Consulting for the Administration while working for a State agency is forbidden. *Id.* The regulations further prohibit a physician or psychologist from participating in review or determination of a case if the physician or psychologist has previously treated a claimant. *Id.*[2] Because Dr. Pati did not work for

---

**2.** "Sometimes physicians and psychologists who do review work for us will have prior knowledge

of a case; for example, when the claimant was a patient. Where this is so, the physician or psy-

the State at the time he reviewed the claimant's file for the ALJ, did not previously treat the claimant, and did not previously participate in the 1993 claim currently before this court, the agency's regulation does not expressly prohibit his participation.

■ Nevertheless, Dr. Pati's prior involvement with claimant does raise the issue of conflict of interest. In general, except when the agency's action is expressly proscribed, conflict of interest is to be evaluated on a case-by-case basis. *See, e.g.*, 56 Fed.Reg. 36932, 36946 (Aug. 1, 1991) (stating that the SSA has adopted a case-by-case approach to determine whether a conflict exists between the financial interest of a particular family member and the responsibilities of the State agency medical or psychological consultant). The question presented here is whether the ALJ's consultation of a medical expert, who reviewed a previous disability application from the same claimant, covering a substantial portion of the disability period alleged in the current case, raises an implication of possible conflict of interest.

In 1991, Dr. Pati, while working for the State of Oregon, rendered an opinion that claimant was not disabled from August 14, 1986 through December 11, 1991, pursuant to claimant's 1990 claim for disability benefits. In 1995, Dr. Pati, while working as a consultant to the Social Security Administration, again rendered an opinion regarding the claimant's alleged disability, for the period from August 14, 1986 through January 20, 1995, pursuant to claimant's 1993 claim. As with claimant's 1990 claim, the decisionmaker followed Dr. Pati's recommendation and rejected claimant's 1993 application for benefits.

Social Security regulations state that "[a]ll implications of possible conflict of interest" will be avoided. 20 C.F.R. § 416.919q. Because claimant was before the ALJ claiming

disability since August 14, 1986 and Dr. Pati had previously rendered an opinion that claimant was not disabled through December 3, 1991, Dr. Pati's participation as an impartial expert witness in claimant's hearing raises *at least* an implication of possible conflict of interest. Dr. Pati had previously found that claimant was not disabled through December 3, 1991; therefore, he would have had to reverse his prior medical diagnosis, based upon the same facts, to find for claimant in this case. Dr. Pati's prior evaluation of the same medical evidence, albeit for a different case, thus raises an implication of possible conflict of interest and, therefore, his testimony at claimant's hearing violated the agency's regulations.[3]

### 2. Waiver

■ Because the agency violated its own regulation, I must now decide whether a claimant can waive that regulation and, if so, whether claimant's failure to object to Dr. Pati giving testimony at the hearing constituted a waiver. Social Security regulations give claimant the right to object to examination by a designated physician or psychologist when claimant suspects the examiner may be biased. 20 C.F.R. §§ 404.1519j, 416.919j. Examples provided in these regulations include situations where a consultative physician or psychologist has previously represented an interest adverse to the claimant or has examined claimant in connection with a previous disability determination that was unfavorable to him. *Id.* If the claimant objects to the designated physician or psychologist, then the agency will attempt to procure a different consultative physician or psychologist; otherwise the consultative examination proceeds. *Id.*

If bias were the only issue concerning the propriety of Dr. Pati's involvement, then claimant's failure to object to his appearance at the hearing might have been a valid waiv-

---

chologist will not participate in the review of determination of the case." 20 C.F.R. § 416.919q.

**3.** The ALJ did find that the Social Security Administration's disposition of claimant's December 14, 1990 claim was *res judicata* with respect to claimant's disability prior to December 12, 1991. Nevertheless, the hearing transcript

shows that Dr. Pati believed, at the time he testified, that claimant's disability over the entire period was at issue. Therefore, an implication of a possible conflict of interest between Dr. Pati (the ALJ's consultant) and Dr. Pati (the State's expert disability claim reviewer) existed at the time of the hearing.

er of his right to object under 20 C.F.R. §§ 404.1519j and 416.919j. However, as I explained above, Dr. Pati's involvement in the January 20, 1995 hearing essentially resulted in him reviewing his own prior opinion on claimant's disability.

The question presented is not whether claimant may waive an objection on the grounds of bias, but whether he may waive a possible conflict of interest. In comments published concurrently with the regulations on consultative examinations, the Social Security Administration states that waiver of conflict of interest by the claimant might be appropriate where waiver is to the claimant's advantage. 56 Fed.Reg. at 36947. The comments give three examples: when no other physician or psychologist with the prerequisite expertise is reasonably available, when denial of waiver would result in inordinate scheduling delays or extensive travel by claimant, and when other physicians or psychologists are available but unable to examine the claimant due to institutional confinement or other conditions. *Id.* None of the examples apply to this claimant's case. The record contains no evidence that other medical experts were not reasonably available for the hearing, that obtaining a different expert would have resulted in inordinate delay, or that any other conditions made waiver of Dr. Pati's possible conflict of interest advantageous to the claimant. Because the record as a whole does not indicate that Dr. Pati's involvement at the hearing was to the claimant's advantage, I find that waiver of a conflict of interest, in this case, is not appropriate.

▄▄▄ Moreover, even if waiver of a possible conflict of interest, not in the claimant's interest, were permissible, I do not find that claimant's waiver at the hearing was valid. Waiver is the intentional relinquishment of a known right with knowledge of its existence and the intent to relinquish it. *See CBS v. Merrick,* 716 F.2d 1292, 1295 (9th Cir.1983). The record does not establish that claimant had knowledge of the extent to which Dr. Pati's involvement in the two applications overlapped or of his right under agency rules to request another expert. At the hearing, the ALJ informed claimant that Dr. Pati

reviewed his 1990 claim. He then asked claimant if he had any questions or objections concerning Dr. Pati's presence. When the claimant failed to object, the ALJ proceeded. The ALJ did not tell claimant that Dr. Pati might have a conflict of interest or that Dr. Pati's conclusion in review of claimant's 1990 claim was unfavorable to claimant. Nor did the ALJ inform claimant that, under 20 C.F.R. §§ 404.1519j and 416.919j, claimant had a right to request, and was likely to receive, a different expert. Because claimant lacked actual knowledge of information essential to making a fully informed decision, and especially because claimant was not represented by counsel until after the hearing and, therefore, unlikely to have been able to find this information himself, his waiver was invalid.

Dr. Pati's testimony at claimant's trial posed a possible conflict of interest; waiver of that possible conflict of interest was not in the claimant's interest; and, furthermore, claimant's apparent waiver was invalid. Under these circumstances, Dr. Pati should not have testified and therefore this court will discount his testimony when reviewing the ALJ's opinion.

## C. *Excess Pain Testimony*

▄▄▄ Claimant next alleges that the ALJ incorrectly discounted claimant's excess pain. The Ninth Circuit requires that the ALJ perform a two-step analysis before rejecting a claimant's subjective symptom testimony. *See Smolen v. Chater,* 80 F.3d 1273, 1281 (9th Cir.1996). Step one requires that claimant: (1) produce objective medical evidence of an impairment or impairments; and (2) show that the impairment or combination of impairments could reasonably be expected to produce some degree of symptom. *Id.* at 1281–82. If claimant satisfies both parts of step one, then step two requires an analysis of the claimant's credibility. *Id.* at 1281. The ALJ, in performing the assessment, may reject the claimant's testimony only by offering specific, clear and convincing reasons for doing so. *Id.* at 1284.

▄▄▄ Because the improperly admitted testimony from Dr. Pati was relevant to the ALJ's assessment of the claimant's credibili-

ty, his finding that the claimant's testimony regarding excess pain was not credible cannot stand. The ALJ discounted Dr. Stephen Sullivan's opinion, which was the most current psychological evaluation in claimant's file at the time of the hearing, because, among other reasons, it was inconsistent with Dr. Pati's evaluation.[4] Generally, claimant's medical records indicated that claimant experienced pain symptoms disproportionate to his objective pathologies. Several doctors have even suggested that claimant deliberately exaggerated his symptoms. By contrast, Dr. Sullivan found claimant's symptoms to be real and debilitating, concluding that "the physical effects of his emphysema and the emotional manifestations of his depression render it very unlikely that he would be able to maintain persistence, concentration and effort on a consistent basis for periods of longer than a half hour, if that." Were it not for Dr. Pati's testimony, the ALJ might have afforded substantial weight to Dr. Sullivan's opinions and found differently regarding claimant's testimony. Accordingly, I am remanding this case for reconsideration of claimant's excess pain claims in the absence of Dr. Pati's 1995 evaluation and his testimony at the 1995 hearing.

### D. *Mental Functional Limitations*

■ Claimant's remaining arguments challenge the ALJ's findings regarding claimant's mental functional limitations. Claimant alleges that he suffers the listed impairments of affective disorder, somatoform disorder and personality disorder, alone and in combination, and argues that the ALJ's findings to the contrary are unsupported by substantial evidence. Like the ALJ's finding on claimant's excess pain claim, above, the ALJ's findings on claimant's mental function limitations cannot stand. In his opinion, the ALJ stated that "[t]he aforementioned mental functional limitations are based primarily on the testimony of the medical expert witness, Dr. Pati, and his corre-

sponding mental residual functional capacity assessment." Because the ALJ based his findings primarily upon expert medical testimony that he should have excluded, those findings are not based upon substantial evidence. Accordingly, I am also remanding this case for reconsideration of claimant's mental functional limitations claims in the absence of Dr. Pati's 1995 evaluation and his testimony at the 1995 hearing.

IT IS SO ORDERED.

---

4. The ALJ wrote: "Given the evidence of exaggeration noted by Dr. Sullivan, it would have been appropriate to view the claimant's subjective complaints with at least a degree of skepticism, rather than accepting his allegation at face value, as he apparently did. Finally, Dr. Sulli-van's report disagrees with the findings of Dr. Pati, who testified at the hearing as a medical expert ... Accordingly, for the reasons stated above, Dr. Sullivan's opinions regarding the severity of the claimant's mental impairment are not afforded substantial weight."