133 F.3d 927
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Warren LEE, Plaintiff-Appellant,
v.
John J. CALLAHAN,** Acting Commissioner of
the Social Security Administration, Defendant-Appellee.
 No. 96-16013.
 United States Court of Appeals, Ninth Circuit.
 Jan. 29, 1998.
 
 Before REINHARDT, T.G., NELSON, and HAWKINS, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Plaintiff Warren Lee appeals the Commissioner of Social Security's (the "Commissioner") denial of benefits. Lee, who is 43 years old, formerly worked as a "circular distributor" delivering newspapers door to door, but he has not worked since 1990. On March 5, 1992, he applied for Social Security Disability ("disability") and Supplemental Security Income ("SSI") benefits, claiming that he became disabled on October 5, 1990, as a result of chronic alcoholism, multiple skin abscesses, anemia, and weakness. His applications were denied initially and upon reconsideration. Lee filed this action in the district court on June 28, 1995. On cross motions for summary judgment, the district court denied his motion and granted summary judgment in favor of the Commissioner, thus upholding the denial of benefits. On appeal, we reverse and remand for further proceedings.
 
 
 3
 I. New Amendments to the Social Security Act
 
 
 4
 As a threshold matter, the Commissioner argues that recent amendments to the Social Security Act require us to dismiss Lee's appeal. We agree with the Commissioner that the amendments apply to Lee's claim, but disagree that they mandate dismissal.
 
 
 5
 On March 29, 1996, while the motions for summary judgment were pending in the district court, the President signed into law the Contract with America Advancement Act of 1996, Pub.L. No. 104-121, 110 Stat. 847 (1996). Section 105 of that Act (the "Amendments") amends the Social Security Act to deny disability and SSI benefits to persons whose disabilities are the result of alcoholism or drug addiction. Specifically, the new amendments provide that "an individual shall not be considered to be disabled for purposes of this title if alcoholism or drug addiction would ... be a contributing factor material to the Commissioner's determination that the individual is disabled." Pub.L. No. 104-121, §§ 105(a)(1), (b)(1). The district court did not consider the effect of the Amendments.
 
 
 6
 Although the original effective date of the Amendments was unclear, both parties agree that Congress has since made it clear that it intends them to apply retroactively to cases like Lee's that were pending in district court when the Amendments were passed. See Technical Amendments Relating to Drug Addicts and Alcoholics, Balanced Budget Act of 1997, Pub.L. No. 105-33, §§ 5525, 5528 (enacted August 5, 1997). We, therefore, are obligated to apply the Act to Lee's claim. See, e.g., Hawkins v. United States, 30 F.3d 1077, 1082 (9th Cir.1994) (noting that "Congress may amend a statute simply to clarify existing law").
 
 
 7
 Contrary to the Commissioner's contention, however, the Amendments do not require that we automatically dismiss Lee's appeal. According to the Amendments' implementing regulations, the "key factor" in determining whether alcoholism or drug addiction is a "contributing factor material to the determination of disability" is whether an individual "would still [be found] disabled if [he] stopped using drugs or alcohol." 20 C.F.R. §§ 404.1535, 416.935 (1996).[1] Because the agency's interpretation of the Amendments is (1) a permissible construction of the statute and (2) not clearly contrary to congressional intent, we defer to it and deem it controlling. See, e.g., Flaten v. Secretary of Health & Human Servs., 44 F.3d 1453, 1460 (9th Cir.1995).
 
 
 8
 The "material contributing factor" test allows Lee to qualify for benefits if his other medical conditions would today prevent him from working, regardless of whether they were originally caused by his alcoholism. Under the regulations, the issue is not whether those conditions themselves are alcohol-related, but whether in his present condition Lee would be disabled because of them if he stopped drinking. The administrative record shows, among other things, that Lee has alcohol-related liver disease, a history of seizures (which may or may not be related to his drinking), recurring skin abscesses (which may be aggravated by his drinking), and a personality disorder.[2] If those conditions individually or collectively constitute a sufficiently disabling condition apart from his drinking itself, Lee is entitled to benefits because of them.[3] To assess this question, we turn to the district court's decision on the merits.
 
 II. Lee's Disability Claim
 
 9
 Lee argues that the district court erred because it accorded insufficient weight to his treating physicians' opinions that he is disabled. We agree and, therefore, reverse and remand for further proceedings to determine whether Lee's disability would still exist if he stopped using alcohol.
 
 A. Summary of Medical Evidence
 
 10
 The administrative record contains a number of medical reports and opinions. The most important are by: Dr. Pakula (Lee's treating physician); the emergency room at San Francisco General Hospital; Tom Sherwood (a substance abuse counsellor the Haight Ashbury Free Clinic); Dr. Gabby (an examining psychiatrist); Dr. Morgenstern (a non-examining psychiatrist who reviewed Lee's records); Dr. Kullman (an examining psychologist); and Dr. Cohen (another examining psychologist).
 
 
 11
 Dr. Pakula, Lee's treating physician since 1992, issued two reports stating that Lee had a sixteen-year history of chronic alcoholism with daily heavy use of alcohol; alcohol-related liver disease; a history of seizures for which he was treated at San Francisco General Hospital; and recurring skin abscesses aggravated by his alcohol abuse. Dr. Pakula's treatment notes confirm the frequency and seriousness of Lee's abscesses and his alcoholism, as well as listing recurring problems with infections associated with the abscesses and with cysts. Dr. Pakula concluded that Lee was "unable to engage in any form of gainful employment because of these problems ... [and] is in need of intensive, long-term treatment for his alcoholism." He also stated the opinion that Lee's disability was likely to continue indefinitely.
 
 
 12
 The emergency room records from San Francisco General Hospital detail various instances of seizures, nausea, vomiting, diarrhea, and falls and other injuries Lee suffered while inebriated, as well as repeatedly noting Lee's alcohol abuse. The outpatient reports detail Lee's follow-up visit regarding a seizure (noting that the seizure was the result of alcohol withdrawal); as well as a referral for plastic surgery for an infected sebaceous cyst; treatment for various "masses" on his ears and face; diagnosis of "cheezy" drainage from his earlobe, breast, and possibly elsewhere; and diagnosis of a second seizure (not described as alcohol-related). The hospital records also contain test results and reports performed in conjunction with the first seizure.
 
 
 13
 Tom Sherwood, a counsellor at the Haight Ashbury Free Clinic, reported that Lee was undergoing counselling and attending Alcoholics Anonymous meetings at the clinic. Sherwood reported that "[i]f Mr. Lee is to be successful in overcoming his alcoholism and drug addiction he will need to devote all of his energies to recovery for the next several months."
 
 
 14
 Dr. Gabby, a psychiatrist retained by Lee, examined Lee and prepared a report that included a full medical, family, and personal history. According to that history, Lee had suffered from two seizures, for which he was hospitalized. An MRI showed that Lee suffered from some "shrinkage of the brain," and blood tests showed that he has liver damage. He needed dental work and had a pronounced sebaceous cyst on his right cheek that required surgery. He was attending Alcoholics Anonymous meetings five times a week but had not been in a detoxification program. He had considered himself strong and healthy prior to the time when he stopped working, and had never undergone psychotherapy. He gets frequent infections requiring surgery.
 
 
 15
 Dr. Gabby diagnosed alcohol dependence, alcoholic hallucinosis, a personality disorder,[4] anemia, liver disease, frequent infections suggesting that Lee's immune system might be "in jeopardy," a history of seizures and hallucinations, and severe "psychosocial stressors." Gabby stated the opinion that Lee "is profoundly affected by his chronic alcoholism" and is "killing himself as evidenced by a beginning liver disease." He further stated that Lee's condition had worsened considerably during the two preceding years, that Lee was not capable of handling his own funds because of his alcoholism, and that "[t]here is no way he could work and support himself at the time because alcohol is seriously standing in the way."
 
 
 16
 Dr. Morgenstern, a psychiatrist hired by the government, did not examine Lee or issue a report, but he reviewed "most of" Lee's Social Security case file and testified at Lee's hearing as to mental impairment. Dr. Morgenstern stated that, based upon the psychological evaluations he reviewed, Lee showed no evidence of a major organic or mood disorder, and that "he drinks, which is, you know, no disability." Dr. Morgenstern stated that he could not tell whether Lee was suffering from an irresistible craving for alcohol or whether he was (merely) suffering from a craving he was not resisting. Dr. Morgenstern disagreed with Dr. Gabby's diagnosis of a personality disorder; he opined that, based upon the facts that Lee had a few friends and was generally able to perform basic daily functions, Lee did not display a complete social phobia and had only a "slight restriction" on such activities. He concluded based on Lee's medical records that Lee had some difficulties with deficiencies of concentration, hypersomnia (tending to fall asleep), and episodes of "deterioration" in work-like settings. He said Lee needed to take part in a long-term residential treatment program. Ultimately, Dr. Morgenstern stated that he was unable to form an opinion as to whether Lee could or could not control his drinking if he wanted to do so. He also testified that he did not disagree with Dr. Pakula's conclusions about Lee. Finally, he stated that he had a question as to the extent of Lee's liver damage, and that he could not tell whether Lee's perirectal abscess or sebaceous cyst had anything to do with his drinking.
 
 
 17
 Dr. Kullman, a psychologist hired by the government to examine Lee approximately two years before Dr. Gabby's exam, took Lee's history and performed a psychological evaluation. Lee reported that he was unable to work because he fell asleep, and could only stay awake for four or five hours at a time. He also acknowledged his alcoholism. He reported hypersomnia and displayed several large abscesses of unknown origin on his face and body. He reported drinking sixteen 12-ounce beers daily, plus several shots of whiskey. His reported personal and family history were essentially the same as Dr. Gabby described. His daily activities included watching television and drinking, and he expressed his main goal as "I just want to get my health straightened out." Lee reported that he was happy to stay at home and watch television, and was content "as long as nobody comes knocking at my door," though he reported having a few friends. He denied having paranoid delusions or hallucinations.
 
 
 18
 Dr. Kullman diagnosed moderate alcohol dependence, malingering, dysthymia,[5] a "personality order not otherwise specified"[6] with dependent personality features, hypersomnia, and moderate "psychosocial stressors" caused by acute circumstances. He concluded that, "[b]ased on a one-time psychological evaluation and reported history, it appears [Lee's] use of alcohol has not been and is not now a significant impairment in his ability to function effectively in a work situation." Dr. Kullman further concluded that, "[a]lthough there is a slight possibility of an incapacitating somatoform disorder,[7] I am disinclined to accept this and much prefer to believe that his lack of motivation is his primary impairment."
 
 
 19
 Finally, Dr. Cohen, a psychologist hired by the Department of Social Service, conducted a psychological examination of Lee one month after Dr. Gabby did. Dr. Cohen's history of Lee reports that Lee complained of abscesses, alcoholism, anemia, multiple infections, sleep problems, seizures, and a cough resulting from smoking. The history is in all respects far less complete and detailed than those taken by Drs. Gabby and Kullman, and does not detail Lee's drinking, his siblings' alcohol problems, or his medical history other than the seizures. Dr. Cohen noted no evidence of delusions, hallucinations, or thought disorder. She stated that she could find "no clear evidence of an organic mental disorder, psychotic disorder, major mood disorder, or anxiety disorder." She diagnosed moderate alcohol dependence, dyssomnia NOS,[8] and moderate psychosocial stressors based upon enduring circumstances. She concluded that she could not assess the true extent or causes of Lee's physical complaints.
 
 B. Analysis
 
 20
 The ALJ rejected the opinions of Dr. Pakula (Lee's treating physician), Tom Sherwood (Lee's treating alcoholism counsellor), and Dr. Gabby (an examining psychiatrist), and based his decision to deny benefits primarily on the report of Dr. Kullman (an examining psychologist), and the testimony of Dr. Morgenstern (a nonexamining psychiatrist). The district court decided that the ALJ's determination was supported by substantial evidence. We review the district court's decision de novo to determine whether the denial of benefits was supported by substantial evidence and application of the correct legal standards. Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir.1996). After doing so, we hold that ALJ erred as a matter of law (1) in rejecting the opinions of Lee's treating doctors in favor of nontreating physicians and (2) in rejecting without sufficient opinion Lee's examining psychiatrist in favor of a nonexamining psychiatrist.
 
 
 21
 First, the opinion of a treating physician is entitled to greater weight than the opinion of a nontreating but examining physician. See, e.g., Lester v. Chater, 81 F.3d 821, 830 (9th Cir.1995); Andrews v. Shalala, 53 F.3d 1035, 1040-41 (9th Cir.1995). A treating physician "is employed to cure and has a greater opportunity to know and observe the patient as an individual." Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir.1989), quoted in Andrews, 53 F.3d at 1041. For that reason, a treating doctor's opinion that is not contradicted by another doctor may be rejected only for "clear and convincing" reasons. Lester, 81 F.3d at 830; Baxter v. Sullivan, 923 F.2d 1391, 1396 (9th Cir.1991). "Even if the treating doctor's opinion is contradicted by another doctor, the Commissioner may not reject this opinion without providing 'specific and legitimate reasons' supported by substantial evidence in the record for so doing." Lester, 81 F.3d at 830 (quoting Murray v. Heckler, 722 F.2d 499, 502 (9th Cir.1983); accord Nguyen v. Chater, 100 F.3d 1462, 1466 (9th Cir.1996).
 
 
 22
 Lee testified at his hearing that he was seeing Dr. Pakula approximately twice a month for over two years. Yet the ALJ in his first decision (which was reversed and remanded by the Appeals Council) discounted the conclusions of Dr. Pakula that Lee was unable to engage in any form of employment, that he needed treatment for his alcoholism in an intensive, long-term residential program, and that he would be disabled for the indefinite future. The ALJ's entire explanation for doing so was as follows:
 
 
 23
 Administrative Law Judge finds that this opinion is not supported by specific findings and conclusions and he gives much greater weight to the observation of Dr. Coleman [sic] that the claimant's alcoholism did not disable him as he had worked in the past with a similar level of alcoholism, that the claimant had sufficient mental capacity to work and that he was only prevented from working by a lack of motivation.
 
 
 24
 In his second decision, the ALJ merely made reference to his earlier conclusion, and then proceeded to ignore Dr. Pakula's reports.
 
 
 25
 The ALJ's bare conclusory statement that Dr. Pakula's report was "not supported by specific findings and conclusions" is itself unsupported by substantial evidence, and, therefore, is insufficient to justify the rejection of a treating physician's report in favor of that of a nontreating doctor. See, e.g., Nguyen, 100 F.3d at 1466; Lester, 81 F.3d at 831. Dr. Pakula's two reports are substantially similar. They include a basic medical history detailing Lee's sixteen years of alcohol abuse (as of the date of the more recent report), his liver disease, his seizures, and his abscesses. Based upon Dr. Pakula's treatment of Lee for over two years and four months, the report concludes that (1) Lee would be unable to engage in gainful employment because of his medical conditions; (2) he was in need of intensive, long-term residential treatment for alcoholism; and (3) his disability was "likely to continue for the indefinite future." Although the reports are brief, they are supported by Dr. Pakula's clinical notes from his treatment of Lee. Those notes provided details of Lee's alcoholism and other medical conditions, and show that Pakula attempted to provide Lee with a referral to get treatment for his alcoholism. Dr. Pakula's records also contain copies of clinical tests run on Lee at San Francisco General Hospital as part of Pakula's treatment of him.[9]
 
 
 26
 Nor do the medical findings adopted by the ALJ constitute "specific and legitimate reasons supported by substantial evidence in the record," Lester, 81 F.3d at 830 (quotation omitted), for rejecting the opinion of Lee's treating physicians. The ALJ grossly mischaracterized the medical evidence upon which he purportedly relied to reject Dr. Pakula's conclusions. In giving Dr. Kullman's diagnosis greater weight than Dr. Pakula's, the ALJ specifically credited three statements to Dr. Kullman: " that the claimant's alcoholism did not disable him as he had worked in the past with a similar level of alcoholism, that the claimant had sufficient mental capacity to work and that he was only prevented from working by a lack of motivation." But Dr. Kullman never stated the first opinion the ALJ attributed to him (or anything remotely resembling it), and the third opinion is a clear overstatement of Dr. Kullman's conclusions. Only the second of the statements provides a reasonably accurate summary of one of Dr. Kullman's opinions, but it does not address the primary, if not sole, question the doctors' reports were intended to assist the ALJ in answering: whether alcoholism and related health problems affected Lee's ability to work.
 
 
 27
 Second, the ALJ's rejection of examining-physician Dr. Gabby's report was not supported by sufficient findings. The opinion of an examining physician is entitled to greater weight than that of a nonexamining physician, and can only be rejected for specific and legitimate reasons supported by substantial evidence in the record. Lester, 81 F.3d at 830-31; Andrews, 53 F.3d at 1043. The ALJ's stated reasons for rejecting Dr. Gabby's opinions were as follows:
 
 
 28
 Dr. Gabby notes a personality disorder in addition to the alcoholism, but there is no corroborating evidence of a personality disorder in the psychological evaluations. Moreover, all of the psychologist [sic] concluded that the claimant is capable of performing work activities. The medical expert, Dr. Morgenstern, although he was somewhat equivocal, noted that all of the psychological reports, except the psychiatric report by Dr. Gabby, were consistent in showing no evidence of a major organic or mood disorder, and Dr. Morgenstern further testified that there was no evidence of a personality disorder, contrary to Dr. Gabby's diagnosis. Dr. Morgenstern, regarding the claimant's ability to work, testified that his only problem would be the smell of beer on his breath from drinking beers in the morning.
 
 
 29
 The ALJ's statements regarding the failure of the other psychological examiners to find evidence of a personality disorder are directly contradicted by the record. Dr. Kullman specifically found that Lee had a personality disorder, and a comparison of Drs. Gabby's and Kullman's reports reveals that the two doctors not only both diagnosed such a disorder but in fact diagnosed precisely the same type of personality disorder, as evidenced by the fact that they assigned to Lee the same diagnostic code from the Diagnostic and Statistic Manual of Mental Disorders.[10] Moreover, Dr. Kullman also diagnosed a dysthymia and Dr. Cohen diagnosed dyssomnia.
 
 
 30
 The chief or sole reason that the ALJ ignored Dr. Gabby's report appears to be that it conflicted with the testimony of Dr. Morgenstern. Dr. Morgenstern, however, was a nontreating, nonexamining physician. Moreover, as the ALJ candidly admitted, Dr. Morgenstern was "somewhat equivocal," but he agreed with Dr. Pakula's conclusion that Lee required long-term residential treatment for his alcoholism. In the absence of any other, more accurate and specific findings based on the record, the ALJ committed an error of law in ignoring Dr. Gabby's clinical findings based upon his stingy interpretation of Dr. Morgenstern's equivocal testimony.
 
 III. Conclusion
 
 31
 Because the ALJ's reasons for ignoring the reports of treating physician Dr. Pakula and examining-physician Dr. Gabby were neither specific nor supported by substantial evidence in the record, we reverse the ALJ's denial of benefits. Due to the Amendments to the Social Security Act, however, we remand to the district court with instructions to remand the case to the Agency for further proceedings to determine whether Lee's disability would exist if he stopped using alcohol.
 
 
 32
 REVERSED and REMANDED.
 
 
 
 **
 John J. Callahan is substituted for the former Commissioner, Shirley S. Chater, pursuant to Fed. R.App. P. 43(a)(1)
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3
 
 
 [1]
 The two regulations, which are identical except that one applies to disability benefits and the other applies to SSI benefits, provide in full as follows:
 (b) Process we will follow when we have medical evidence of your drug addiction or alcoholism. (1) The key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether we would still find you disabled if you stopped using drugs or alcohol.
 (2) In making this determination, we will evaluate which of your current physical and mental limitations, upon which we based our current disability determination, would remain if you stopped using drugs or alcohol and then determine whether any or all of your remaining limitations would be disabling.
 (i) If we determine that your remaining limitations would not be disabling, we will find that your drug addiction or alcoholism is a contributing factor material to the determination of disability.
 (ii) If we determine that your remaining limitations are disabling, you are disabled independent of your drug addiction or alcoholism and we will find that your drug addiction or alcoholism is not a contributing factor material to the determination of disability.
 
 
 [20]
 C.F.R. §§ 404.1535, 416.935 (1996). Although the regulations predate the passage of Pub.L. 104-121, the Commissioner treats them as controlling for purposes of the new amendments
 
 
 [2]
 See infra Section II.A for a more complete medical history
 
 
 [3]
 Under the Amendments, Lee would have to receive his benefits payments through a "representative payee" rather than getting them directly. See § 105(a)(2), (b)(2)
 
 
 [4]
 According to the Diagnostic and Statistical Manual of Mental Disorders ("DSM-III-R") (1987), the particular disorder Dr. Gabby diagnosed is defined as follows:
 Disorders of personality functioning that are not classifiable as a specific Personality Disorder. An example is features of more than one specific Personality Disorder that do not meet the full criteria for any one, yet cause significant impairment in social or occupational functioning, or subjective distress.
 Id. at 358 (emphasis added).
 
 
 [5]
 DSM-III-R defines dysthymia or "depressive neurosis" as:
 a chronic disturbance of mood involving depressed mood ..., for most of the day more days than not, for at least two years.... In addition, during these periods of depressed mood there are some of the following associated symptoms: poor appetite or overeating, insomnia or hypersomnia, low energy or fatigue, low self-esteem, poor concentration or difficulty making decisions, and feelings of hopelessness.
 Id. at 230.
 
 
 [6]
 This diagnosis is the same as that made by Dr. Gabby. Again, according to DSM-III-R, the disorder causes "significant impairment in social or occupational functioning, or subjective distress."
 
 
 [7]
 DSM-III-R defines a somatoform disorder as involving:
 physical symptoms suggestion physical disorder (hence, Somatoform") for which there are no demonstrable organic findings or known physiologic mechanisms, and for which there is positive evidence, or a strong presumption, that the symptoms are linked to psychological factors or conflicts. Unlike in Factitious Disorder or Malingering, the symptom production in Somatoform Disorders is not intentional, i.e., the person does not experience the sense of controlling the production of the symptoms.
 Id. at 255.
 
 
 [8]
 DSM-III-R defines this condition as "[i]nsomnias, hypersomnias, or sleep-wake schedule disturbances that cannot be classified" in any specific DSM category. Id. at 308
 
 
 [9]
 We also note that the ALJ was "required to give weight not only to the treating physician's clinical findings and interpretation of test results, but also to his subjective judgments." Lester, 81 F.3d at 832-33. Thus, the ALJ would not have been free to discount or devalue the reports even if the implication of his decision--that Dr. Pakula's opinions were chiefly subjective--was correct
 
 
 [10]
 To the extent that the two opinions do differ as to their diagnoses or conclusions, Dr. Kullman's examination occurred two years earlier, and Dr. Gabby specifically determined that Lee's condition had worsened since that earlier exam. The ALJ failed to comment on either of those facts