GOULD, Circuit Judge,
dissenting:
Nobody disputes the Department of Veterans Affairs’ (“VA”) assessment, nor is it directly at issue, that as of 1997 Turner has been completely disabled by PTSD. And nobody disputes the ALJ’s correct conclusion that Turner was severely impaired by PTSD on or before his date last insured (“DLI”), December 31, 1990. The only issue in this appeal is whether Turner’s severe PTSD-related impairments became disabling, as that term is understood in the context of eligibility for social security disability insurance benefits, before December 31, 1990. If so, Turner is entitled to disability insurance benefits. The ALJ erred in deciding this issue by not giving clear and convincing reasons for rejecting Dr. Koogler’s uncontradicted PTSD opinion and by not considering evidence probative of the severity of Turner’s debilitating PTSD. I would reverse and remand the matter for an award of benefits.
Turner’s PTSD stems from trauma he endured while serving our country in Vietnam. Commentators recently described the features of the Vietnam War that increased the prevalence of PTSD among its returning veterans as follows:
[T]he war presented the American military with a relatively new kind of warfare — guerrilla warfare. The very nature of guerrilla warfare expands the number of combatants placed in danger, encompassing both soldiers directly involved in the fighting and those working in what had traditionally been a relatively removed and safe logistical capacity. During the Vietnam War, there were no front and rear lines; the combat zone came to surround the soldiers virtually anywhere they were in that country at all times. Furthermore, because combatants are not clearly identified in this type of warfare, soldiers found it difficult to know who was friend or foe. For example, Vietnamese “civilians” could turn out to be Viet Cong operatives. Hence, many soldiers assumed a hyper-vigilant or “survivor mode” state of mind in which they attempted to be constantly aware of their surrounding environment in order to anticipate and react to potential attacks and life-threats. Unfortunately, many times this mode did not “turn off’ when the soldiers returned home. As a result, many veterans manifested enduring psychological problems after returning to civilian life.
Thomas L. Hafemeister & Nicole A. Stockey, Last Stand? The Criminal Responsibility of War Veterans Returning From Iraq and Afghanistan with Posttraumatic Stress Disorder, 85 Ind. L.J. 87, 99-100 (2010) (footnotes omitted).
Turner’s combat experience in Vietnam exposed him to terrible things that most civilians could never imagine. Turner’s duties in Vietnam included, among other things, serving as a so-called tunnel rat. A tunnel rat’s job was to descend into a Viet Cong tunnel — typically equipped with only a pistol, knife, and flashlight — and clear hostile forces from within the tunnel. See 1 Encyclopedia of the Vietnam War: A Political, Social, and Military History 141 (Spencer C. Tucker ed., 1998). Because of the “physically and psychologically draining” nature of this work, “most tunnel rats served relatively short periods.” Id. Turner recalls two events in particular that still haunt him. First, Turner and his platoon discovered the remains of seven American soldiers who had been skinned alive a week earlier. Second, Turner watched a helicopter crash, killing all aboard, while Turner’s own heli *1227 copter was taking fire. Also, Turner was not personally spared from the violence of the war. His military medical records show that he was hospitalized and underwent skin-graft surgery for missile and bullet wounds that he sustained during a firefight with hostile forces. It is beyond dispute that these experiences demonstrate Turner’s “direct personal experience of an event that involves actual or threatened death or serious injury.” See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 463 (4th ed., text rev. 2000) (“DSM-IV-TR”) (stating that this “essential feature” of PTSD may arise from military combat).[1]
Dr. Koogler was an examining doctor for Turner. Prior to the DLI, Dr. Koogler described without equivocation that Turner employed in civilian life the isolating hypervigilance and distrustfulness that Turner and other soldiers relied on to survive in Vietnam, even though these trained responses are preventing Turner’s successful reintegration into civilian life. Upon returning to his home after being gone for a period of time, Turner surveys his property for tire tracks and footprints, and checks his house thoroughly. Dr. Koogler also noted that Turner is “suspicious of anyone carrying a gun” because “he feels like they are a potential enemy, and this is particularly true of the police department.” Turner thinks about Vietnam daily and the sound of a helicopter triggers flashbacks. This should be an obvious red flag for urban life where the sound of helicopter traffic is not uncommon. Turner became “involved as little as possible[ ] with people.” It is within this context that Dr. Koogler diagnosed Turner with PTSD and opined that Turner “has been able to maintain himself without severe problems with his PTSD by isolating himself from society and living out in the country.” The logical and necessary inference from Dr. Koogler’s opinion is that Turner would not be able to maintain himself in an ordinary work environment where he must interact and coordinate with other people.
Because Dr. Koogler’s opinion was uncontradicted, the ALJ erred by not providing clear and convincing reasons for rejecting Dr. Koogler’s opinion. See Lester v. Chater, 81 F.8d 821, 830 (9th Cir.1995) (“[T]he Commissioner must provide ‘clear and convincing’ reasons for rejecting the uncontradicted opinion of an examining physician.”). The ALJ relied on Dr. Crossen’s hearing testimony, stating, “As Dr. Crossen pointed out, Dr. Koogler’s report does not necessarily imply that the claimant is incapacitated by PTSD.” The ALJ misapprehended Dr. Crossen’s view. Dr. Crossen concluded that Turner’s impairments were “at least moderate and maybe severe.” Dr. Crossen did not disagree with Dr. Koogler’s opinion. Instead, Dr. *1228 Crossen stated, “I don’t see any reason to say [Dr. Koogler’s] opinion is wrong, but on the other hand there’s not a whole lot here to say that it’s right except that, you know, it’s just an opinion.” Dr. Crossen’s view, which at worst from Turner’s perspective is equivocal, is not a clear and convincing reason to reject Dr. Koogler’s explicit opinion that Turner’s problems with severe PTSD can only be avoided by isolation. See id. at 831 (“The opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician.”).
The ALJ’s incorrect conclusions that Dr. Koogler’s opinion was based almost entirely on Turner’s self-reports and that Dr. Koogler did not cite objective findings that support Turner’s disability from PTSD similarly are not clear and convincing reasons for rejecting the opinion. Dr. Koogler noted many aspects of his assessment, not generated by Turner’s own complaints, that led to his view of Turner’s PTSD. For example, Dr. Koogler noted Turner’s “severe startle response,” that Turner “jumps clear out of his chair” when the phone rings in Dr. Koogler’s office, that Turner “has severe difficulty concentrating,” and that Turner “has an extreme restricted affect throughout the whole interview and does not display much in the way of emotion, except for a startle response with the unexpected noise.” See DSM-IV-TR 464 (stating that PTSD’s symptoms include “hypervigilance,” “exaggerated startle response,” “difficulty concentrating,” “[diminished responsiveness,” “persistent symptoms of anxiety,” and “markedly reduced ability to feel emotions”). The ALJ ignored the value that these objective clinical findings have in supporting Dr. Koogler’s conclusion that Turner requires rural isolation from society to cope with his severe PTSD. See id. (stating that those with PTSD “commonly make[ ] deliberate efforts ... to avoid activities, situations, or people” that might trigger flashbacks or intrusive recollections of traumatic events). Instead, the ALJ, in determining Turner’s residual functional capacity, cleared Turner “to perform work at any exertion level.” Although the ALJ professed to limit Turner to “simple and routine work” in an environment where there was not “a lot of background activity” and “no contact with the public,” even these limitations do not account for Dr. Koogler’s conclusion that Turner needs to be isolated from society and live out in the country just to maintain himself.
Moreover, it is not as if Turner’s story of his PTSD is not supported by witnesses. To the contrary, and in a real sense, each day that Turner lives in an isolated area, bereft of the normal incidents of companionship that attend urban life and most jobs, stands as a silent confirming witness attesting to Turner’s real difficulties. Why else would he live in the middle of nowhere? Why else would he be in large part a lone wolf, hypervigilant against imagined dangers?
The ALJ’s erroneous conclusion that Turner’s PTSD “is not shown to have been disabling in the period through [the DLI]” ignored not only Dr. Koogler’s opinion but additional relevant evidence post-dating Turner’s DLI that should have been considered. In 1992, within two years of the DLI, social worker John McFarland opined that Turner “would not be able to tolerate any employment which required any sort of structure, answering to bosses, or dealing with people” and, “[r]egarding employability, the veteran is doing just about all that he can do presently.” The VA also determined that Turner was 100% disabled as of 1997. The ALJ did not consider this evidence. While the ALJ must consider only impairments (and limi *1229 tations and restrictions therefrom) that Turner had prior to the DLI, evidence post-dating the DLI is probative of Turner’s pre-DLI disability. See Smith v. Bowen, 849 F.2d 1222, 1225 (9th Cir.1988) (“[MJedical evaluations made after the expiration of a claimant’s insured status are relevant to an evaluation of the pre-expiration condition.”). Because the ALJ recognized that Turner’s “activities and reported symptoms ha[d] not really changed over the years,” McFarland’s assessment and the VA’s subsequent 100% disability-rating were especially probative of the disabling nature of Turner’s PTSD before the DLI and therefore should have been considered by the ALJ.
In sum, Turner is the real deal — a decorated Vietnam veteran with two purple hearts who had a hard time of it over there, fighting an often unseen enemy, and who, back here, has a hard time of it getting his entitlement from the Social Security Administration. He has continuing problems that prevent him from engaging in substantial gainful employment. Yet the Social Security Administration is deaf and blind to this. Contrary to the ALJ’s conclusion that Turner could work as a cleaner, laundry sorter, or folding-machine operator, Turner would be at risk of harming both himself and others if thrust from his beneficial isolation. Living apart in a rural area is a benignant circumstance for Turner. We cannot solve Turner’s problems nor can we cure his PTSD. But the social security benefits to which Turner is entitled — and for which he applied almost eight years ago — might spell the difference between a life with some semblance of dignity and independence, and an alternative with inadequate funds to meet basic needs. I believe that these benefits are his entitlement, they are not an act of welfare, not an act of grace. They are merely and surely his due. I would therefore reverse and remand this case for an award of benefits. See Smolen v. Chater, 80 F.3d 1273, 1292 (9th Cir.1996) (reversing and remanding for an award of benefits where “a finding of disability is clearly required” and “[the claimant] has already waited over seven years ... and additional proceedings would only delay her receipt of benefits”).

. Given the gruesome shocks that follow in the train of war, it is not surprising that our young men and women returning from Vietnam have such a high incidence of PTSD. One congressional study concluded that 30.6% of male Vietnam veterans have PTSD at some point during their lives, and 15.2% of male veterans were still plagued by full-blown PTSD ten years after the Vietnam War ended. See Richard A. Kulka et al., Trauma and the Vietnam War Generation: Report of Findings from the National Vietnam Veterans Readjustment Study xxiii, xxvii (1990). Male veterans with high levels of war-zone exposure, as might be said about Turner, are still more likely to continue to suffer from full-blown PTSD. United States Department of Veterans Affairs, Findings from the National Vietnam Veterans’ Readjustment Study, http://www. ptsd.va.gov/professional/pages/vietnam-vetsstudy.asp (last visited June 2, 2010) ("Those with high levels of warzone exposure had significantly higher rates, with 35.8% of men and 17.5% of women meeting criteria for current PTSD.”).